LUV N' CARE, LTD. and
ADMAR INTERNATIONAL, INC.,

        Plaintiffs,

v.

ROYAL KING INFANT PRODUCTS CO,
LTD. and DALBIR SINGH KHURANA,

        Defendants.

Civil Action No. 2:10-cv-00461-DF-CE

(JURY TRIAL DEMANDED)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS UNDER FRCP 12(b)(2) AND 12(b)(6)

Plaintiffs Luv n' care, Ltd. ("Luv n' care" or "LNC") and Admar International, Inc. ("Admar") (hereinafter collectively referred to as "Plaintiffs") submit this memorandum of law, together with the declaration of Nouri E. Hakim ("Hakim Decl.") and the declaration of Benjamin H. Graf ("Graf Decl."), in opposition to the motions of Defendants Royal King Infant Products Co, Ltd. ("Royal King" or "RK") and Dalbir Singh Khurana ("Khurana") (hereinafter collectively referred to as "Defendants") to dismiss certain claims of Plaintiffs' Amended Complaint ("AC") with respect to Khurana, under Fed. R. Civ. P. 12(b)(2), and to dismiss all claims under Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Defendants' motion to dismiss for lack of personal jurisdiction ("the 12(b)(2) motion"), and its Fed. R. Civ. P. 12(b)(6) motion filed on the same day ("the 12(b)(6) motion") (hereinafter collectively referred to as the "motions to dismiss"), are the latest attempts by Defendants to

evade justice and postpone adjudication of their fraudulent, malicious, and tortious conduct against Plaintiffs.  As explained below, both motions are without merit and should be denied in their entirety.  For the Court's convenience and efficiency, and in view of the overlapping facts and issues, Plaintiffs respond to both motions with the present consolidated response.[1]

Procedural History

This case is already well over a year old.  Plaintiffs' Complaint was filed on November 4, 2010 (Dckt. 1).  After filing, Plaintiffs' attorneys contacted Scott Daniels, counsel for RK, to determine whether counsel would accept service on behalf of Defendants.  Counsel contacted his clients, who would not consent.

As a result, Plaintiffs then had the Complaint translated into the Thai language for foreign service purposes.  On January 19, 2011, Plaintiffs sent to the Clerk of this Court the necessary documents to serve Defendants pursuant to Fed. R. Civ. P. 4(f)(2)(C)(ii) and 4(h)(2).  Those documents were delivered by FedEx to Defendants on January 24, 2011, but Defendants refused delivery to evade service.

Accordingly, on February 2, 2011, Plaintiffs moved for issuance of Letters Rogatory to serve Defendants pursuant to Fed. R. Civ. P. 4(f)(2)(B) and 4(h)(2).  On February 15, 2011, this Court granted the Motion by Order and issued Letters Rogatory so that Plaintiffs could serve the Complaint on Royal King and Khurana in Thailand via the appropriate Thai judicial authority. Plaintiffs then forwarded the Letters Rogatory to experienced process servers (the same process servers who are utilized by the U.S. government for service in foreign countries), to complete the

---

[1]    Although the present response is slightly over the thirty page limit for responses set forth by the Local Rules of this Court, Plaintiffs note that they are permitted sixty pages of response to Defendants two motions (thirty pages for each of the two separate motions).  Accordingly, Plaintiffs respectfully submit that the present response is well within the page limit, or, alternatively, respectfully request that it be so deemed or that a several page extension be granted.

service process with the Thai authorities. Plaintiffs' agents then made several diligent attempts to serve the Complaint on Defendants in Thailand. After Defendants were finally served on August 25, 2011 by Thai authorities pursuant to Letters Rogatory issued by this Court (Dckt. 9), Defendants once again tried to delay this suit from progressing by contending that service was improper under Thai law, despite the fact that the Thai authorities had certified that service was indeed entirely proper under their legal provisions. To resolve this issue, Plaintiffs consented to an additional fourteen days to allow Defendants to respond to the Complaint (Dckt. 11).

Instead of filing an Answer, on December 7, 2011, Defendants filed baseless motions to dismiss the Complaint under Rules 12(b)(2) and 12(b)(6). Though Plaintiffs' initial Complaint were more than adequate to completely do away with Defendants' purported doubts, Plaintiffs responded to the December 7th motions by amending the Complaint to include ***even more unrefuted facts*** concerning Defendants' illegal activities and their contacts with Texas. (Dckt. 20.)[2] Defendants have now avoided answering yet again, and file the present motions to dismiss to delay further. In the meantime, as Defendants continue their dilatory tactics, they simultaneously persist in the illegal activities that are the subject matter of this Complaint – deliberately knocking-off Plaintiffs' unique baby product designs, and damaging Plaintiffs' business in the U.S. and foreign countries. Moreover, as explained further below, those illegal

---

[2] Because an amended complaint does not automatically moot a motion to dismiss, Plaintiffs also opposed the December 7th motions with an opposition memorandum of law. Contrary to Defendants' position (*see* Dckts. 26 and 27 at fn 2.), the law is clear in the Eastern District of Texas that Plaintiffs' amended complaint did not automatically moot the first motions to dismiss: "While amending the complaint may cure deficiencies raised in a motion to dismiss, the simple act of filing an amendment does not automatically moot a motion to dismiss." *Frye Family P'ship v. Rough Creek Investors GP, LLC*, 2011 U.S. Dist. LEXIS 83618, *5 (E.D. Tex. July 8, 2011), *adopted*, 2011 U.S. Dist. LEXIS 83658 (E.D. Tex. July 29, 2011).

activities are in direct violation of a Settlement Agreement entered the last time Plaintiffs were forced to bring suit before this Court to redress Defendants' same illegal conduct.

<u>History Between the Parties</u>

By way of background, Luv n' care designs, develops, distributes and sells innovative baby products throughout the world, and is a well-known and highly regarded mainstay of the US and international baby products industry. It owns numerous design and utility patents which cover their extremely popular inventions and designs. Its affiliate Admar is the owner of all right, title and interest in and to the trade dress of Luv n' care's unique and appealing product designs, which were developed through substantial time, expense, and ingenuity.

This action relates back to an earlier litigation ("the Prior Litigation") before this Court in which Plaintiffs sued Royal King for infringing its intellectual property. Specifically, Royal King was sued for deliberate piracy in intentionally copying an entire series of Plaintiffs' unique product designs and unlawfully selling those knock-offs for profit. (*See*, Amended Complaint, Ex. 30, Dckt. 20-30.)

Rather than risk being found liable for treble damages for its willful infringement, including punitive damages under state law, Royal King entered into a Settlement Agreement with the Plaintiffs on June 22, 2009 ("the Agreement"). (Dckt. 20-1.) In the negotiations leading up to the Agreement, Khurana (the then President of Royal King), represented to Plaintiffs that RK had obtained $3.3 million in revenue from its various infringing products, including $2.3 million in US sales, and an additional $1 million in international sales (Dckt. 20, ¶163; Hakim Decl., ¶¶ 14-18 and Ex. 1). Based upon that representation – which has since been determined to be fraudulent, and based on other representations of RK and Khurana, Luv n' care agreed to settle for a 12% royalty on those past sales, in the amount of $396,000, plus attorneys' fees.

(Dckt. 20, ¶ 170; Hakim Decl., ¶¶ 19-21 and Ex. 2.)   In addition, RK was bound by the Agreement to "immediately cease and desist worldwide from making, selling, offering to sell, marketing, and/or promoting the [infringing] Products, including any versions of the Products or their packaging that are likely to cause confusion with [Luv n' care's] products or packaging." (Dckt. 20-1, ¶ 6)

Yet, since execution of the Agreement, itself effectuated by Defendants' fraudulent representations, Defendants have persisted in selling infringements worldwide of the very same products and packaging at issue in the Prior Litigation, in direct breach of the Agreement. Defendants have also knowingly, willfully, and tortiously interfered with Luv n' care's existing and prospective contracts and business relationships by approaching existing and prospective customers of Luv n' care and selling them the RK knock-offs at a discount, preventing Luv n' care from effectively competing in the marketplace.   Moreover, Defendants have been selling their knock-offs at a lower price due to the lack of any research and development costs. Defendants' pirating of Plaintiffs' products since execution of the Agreement has further infringed one or more of Plaintiffs' patents. (Dckt. 20, ¶¶ 225-233.)

Plaintiffs have been substantially injured by Defendants' continued illegal actions.   Thus, Plaintiffs were forced to bring the present lawsuit in this Court – the same venue as the prior litigation.

### The Present Motions

In an effort to further delay litigation of the merits of Plaintiffs' causes of action, Defendants have filed two new motions to dismiss the Amended Complaint under Rules 12(b)(2) and 12(b)(6).  Those motions are entirely without merit.

In their motion papers, Defendants fail to deny (much less refute) virtually <u>any</u> of the allegations contained in the Complaint. ***Tellingly, Defendants, having moved to dismiss twice now with two different declarations from Khurana, still have not denied that they have continued to sell worldwide the products accused in this litigation – in direct violation of the Settlement Agreement – since the Agreement was executed.***[3]

The only denials set forth in Defendants' papers are a series of statements in Khurana's Declaration (Dckt. 26-1) that are misleading at best, and perjured at worst, misrepresentations made to try to convince the Court to dismiss various causes of action herein. The most egregious misstatements in Khurana's Declaration, come from his statements, under penalty of perjury, that: (1) he never "contracted with or entered into any written or verbal agreements with anyone in Texas related to infant feeding and baby care products and have never packaged or otherwise prepared any infant feeding and baby care products for shipment to Texas" (Dckt. 26-1, ¶ 5);[4] and (2) "at no time since signing of the Settlement Agreement has Royal King shipped, sold, or

---

[3] Despite Defendants' clear advantage in reviewing Plaintiffs' first opposition brief to their motions to dismiss in which Plaintiffs' emphasized Defendants' failure to deny any of the illegal acts they were accused of, in their second bite at the apple Defendants now deny their alleged conduct with respect to a mere ***two (2)*** of the more than ***sixty (60)*** accused products. (Dckt. 26-1, ¶ 10.)

[4] Curiously, paragraph 5 of Khurana's present declaration is identical to paragraph 5 of his first declaration filed with the original 12(b)(2) motion, except that he has now limited his statement to himself, instead of himself and Royal King, and has further limited the statement regarding contracting with Texas to contracts involving infant feeding and baby care products only. (*Compare* Dckt. 14-1, ¶ 5 with Dckt. 26-1, ¶ 5; *compare also*, Dckt. 14-1, ¶¶ 3, 6 with Dckt. 26-1, ¶¶ 3, 6.) Defendants might attempt to attribute the former limitation to the fact that the present 12(b)(2) motion concerns Khurana only, whereas their first 12(b)(2) motion concerned both Defendants, itself a revealing retraction of Defendants' former position. But that fails to explain why Khurana elected to include Royal King in his statements in paragraphs 11 and 12 of the *present* Declaration. (Dckt. 26-1, ¶¶ 11-12.) Moreover, the additional new limitation in paragraph 5 is totally inexplicable. Clearly, if Khurana did not perjure himself in his original declaration, then he at least takes an improper and unjustifiably cavalier attitude toward his declarations to the Court. Both of his declarations are thus highly suspect.

manufactured any of the products covered by the Settlement Agreement." (Dckt. 26-1, ¶ 11.)[5] These statements are simply not true.

In fact, and contrary to Khurana's statement, Royal King is a known supplier of H.E. Butt Grocery Company ("HEB"), a supermarket business based in San Antonio, Texas, that operates grocery stores throughout the entire state of Texas. (Hakim Decl., ¶¶ 3-5; Graf Decl., Exs. 1 & 2.) According to HEB's website it has stores in over 150 Texas communities, with Texas being the only state in the U.S. that it services. (Graf Decl., Exs. 1 & 2.)

In Texas, HEB has been extensively retailing baby products manufactured by Royal King, including products that are the subject of the Amended Complaint. It has been doing so since execution of the Agreement. (Hakim Decl., ¶¶ 3-5, 9-13.) Royal King also continues to supply infringing products to Toys R' Us ("TRU") and Dollar General Corporation, who, as Defendants well know, also retail the Royal King knock-offs extensively throughout their stores in Texas. (Hakim Decl., ¶¶ 6-13.) Moreover, it is Plaintiffs' existing and prospective business and contractual relations with these retailers and other entities since the 2009 Agreement, concerning confusing variations of these very same offending products, that form the basis of Plaintiffs' tortious interference claims herein.

Khurana dubiously declares that he lives in ignorant isolation of the fate of his infringing products once they are placed on a ship and into the stream of commerce. (Dckt. 26-1, ¶4.) This statement is truly astonishing coming from the President of a baby products company who frequently touts the global reach of his products and sales. (Graf Decl., Exhibit 3.) Indeed, how could the chief officer of a products manufacturer not know which distributors are buying his

---

[5] This statement is, at best, highly ambiguous, as will be discussed further *infra* in response to the 12(b)(6) motion.

products?  Not only did Khurana oversee and direct placement of the accused products into the stream of commerce; Khurana knew that many of them would, and did, end up in Texas.[6]

In addition to these significant contacts between Khurana and Texas, this Court also has jurisdiction over Khurana by virtue of the explicit terms of the parties' prior Settlement Agreement.

In particular, and first, the Agreement provides that "LNC and Royal King agree that the specific Court before which the Texas civil action was pending, namely, the United States District Court for the Eastern District of Texas, Marshall Division, shall retain sole and exclusive jurisdiction over all of them relating to this Settlement Agreement and/or the subject matter of the EDTX action [the Prior Litigation], with that Court retaining exclusive jurisdiction over the enforcement of any and all rights and obligations under this Settlement Agreement."  (Dckt. 20-1, ¶ 10.)  Each of the causes of action in the present suit indisputably relates to Defendants' rights and obligations under the Settlement Agreement, as well as the formation of the Settlement Agreement itself.

Second, the terms of the Agreement define that term "Royal King," as including its agents, officers, directors and employees, which includes its then President and current "advisor", Dalbir Khurana.  (Dckt. 20-1 , Preamble.)  In fact, Khurana is the very person who negotiated the terms of the Agreement with Luv n' care's CEO.  Thus, under the definition of the term "Royal King" set forth in the Agreement and under the Agreement's jurisdictional

---

[6] Khurana makes additional false or misleading statements in his declaration.  For example, contrary to Khurana's statements in paragraph 7 of his declaration, he was deeply and personally involved in the Prior Litigation's settlement negotiations from the outset, being the only representative of RK to deal directly with LNC's CEO Nouri Hakim, and explicitly stating that he preferred not to get the attorneys involved in the negotiations.  (Hakim Decl., ¶ 14 and Exhibit 3.)  It was also Khurana who, after settlement was finalized, personally wired the RK funds due LNC under the terms of the Agreement.  (Hakim Decl., ¶ 23.)

provision, both the corporate entity and its officer Khurana agreed to jurisdiction in this district for the causes of action herein.

Third, in consideration for Royal King's settlement payment and promise to stop infringing, Luv n' care explicitly promised to, and did in fact, dismiss the Prior Litigation against Royal King in the Eastern District of Texas (Dckt. 20-1, ¶ 7.) The present claims against Royal King and Khurana are directly related to those claims in the Prior Litigation.

Fourth, the parties to the Agreement chose Texas law to govern same. (Dckt. 20-1, ¶ 11).

Other bases for personal jurisdiction exist as well. Having committed fraud and other intentional torts directed at the State of Texas during litigation before this very Court in Texas, Khurana cannot now hide behind Royal King's corporate veil or fiduciary shield to protect himself from the Court's jurisdiction. Employees or officers of corporations who commit intentionally tortious acts are personally liable for those acts, whether or not grounds exist to "pierce the corporate veil." Khurana knowingly committed tortious acts that were specifically directed at the State of Texas and this Court, and is therefore subject to this Court's jurisdiction. Khurana is further subject to this Court's jurisdiction pursuant to the doctrine of pendent personal jurisdiction.

*Not to be discounted, RK does not join Khurana in the latest 12(b)(2) motion, despite being a party to the December 7th 12(b)(2) motion. RK's conspicuous withdrawal is an implied admission that many of Khurana's and RK's shared contacts with Texas – e.g., placing the RK accused products into the stream of commerce since execution of the Agreement for sale in Texas – are legitimate and undeniable.*

Finally, Plaintiffs' Amended Complaint vastly exceeds the minimum requirements of a "well-pleaded" complaint. Plaintiffs need not prove their case in the Complaint. All necessary

elements of the causes of action are properly pled on its face, along with ample supporting facts and factual allegations. Defendants have high burdens to meet if they are to be successful in either one of their motions, and they fall far short on both counts. Indeed, as noted above, Defendants do not even deny the salient allegations of the Complaint. This is aside from the fact that, on a motion to dismiss at this early stage, all inferences must be taken in Plaintiffs' favor.

For these reasons and those more fully set forth below, the motions to dismiss must both be denied.

**ARGUMENT**

## I.     LEGAL STANDARD GOVERNING THE 12(b)(2) MOTION

In defending a motion to dismiss under Rule 12(b)(2), the plaintiff "need not . . . establish jurisdiction by a preponderance of the evidence; a *prima facie* showing suffices." *Luv n' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006), *writ denied*, 548 U.S. 904 (2006); *reh'g denied,* 548 U.S. 934 (2006). "A prima facie case may be established 'by alleging facts in the complaint and affidavits sufficient to establish jurisdiction over the non-resident defendants.'" *In Re Norplant Contraceptive Prods. Liab. Litig.*, 886 F. Supp. 586, 588 (E.D. Tex. 1995), quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 917 (5th Cir. 1987). The Court "must resolve all undisputed facts submitted by the plaintiffs, as well as all facts contested in the affidavits, in favor of jurisdiction." *Luv n' care,* 438 F.3d at 469. "All facts alleged by [Plaintiff] regarding jurisdictional issues must be taken as true for purposes of determining whether Plaintiff has met its burden of proving a prima facie case for the existence of personal jurisdiction." *Ruston Gas Turbines, Inc., v. Donaldson Co., Inc.*, 9 F.3d 415, 421 n. 16 (5th Cir. 1993). *See also*, *Beagles and Elliott Enters., LLC v. Florida Aircraft Exch., Inc.* 70 Fed. Appx. 185, 186 (5th 2003).

Because Texas's long-arm statute "extends to the limits of due process . . . a Texas district court must only perform the federal due process analysis" in deciding a 12(b)(2) motion. *Newell v. Moran Towing Corp.*, 2009 U.S. Dist. LEXIS 89116 at *2 (E.D. Tex. 2009). A Court may exercise "specific" jurisdiction "'in a suit arising out of or related to the defendant's contacts with the forum.'" *Id*, quoting *Helicopteros Nacionales de Colombia, S.A., v. Hall* 466 U.S. 408, 414 (1984) (at n. 8). "A single act by the defendant directed at the forum state . . . can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston*, 9 F.3d at 419.

Specific jurisdiction exists if, by the defendant's act or acts, it "'purposely avails itself of the privileges of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Id.*, quoting *Burger King Corp. v Rudzewicz*, 471 U.S. 462, 475 (1985). "The defendant's conduct must show that it 'reasonably anticipates being haled into court'" in the forum state. *Luv n' care*, 438 F.3d at 4701, quoting *World Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

With respect to lawsuits arising out of tortious or illegal acts concerning products in commerce, the Fifth Circuit "has consistently held that 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.'"[7] *Luv n' care*, 438 F.3d at 470, quoting *Ruston*, 9 F.3d at 419. *See also, Brooks & Baker, L.L.C. v. Flambeau, Inc.* 2011 U.S.

---

[7] This principle is not limited to products liability cases, and extends to the facts at bar. *See e.g., Luv n' care*, 438 F.3d at 472-73 ("we have found jurisdiction where the same public policy concerns that justify use of the stream-of-commerce principle in the products liability context are present"; (internal quotation marks omitted). Not only did the Court in *Luv n' care* hold in favor of personal jurisdiction in a case concerning infringement of intellectual property, it did so in the context of one of the very same infringing products at issue here, which was being sold by a distributor who purchased those products from Royal King.

Dist. LEXIS 112568 at *8 (E.D. Tex. Sept. 30 2011)  The Fifth Circuit has thus "declined to follow the suggestion of the plurality in [*Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987)] that some additional action on the part of the defendant, beyond foreseeability, is necessary to 'convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum State.'" *Luv n' care*, 438 F.3d at 470, quoting *Asahi*, 480 U.S. at 112.  In other words, the Fifth Circuit has adopted the "more relaxed 'mere foreseeability' test" in cases such as this to determine whether specific personal jurisdiction exists. *Luv n' care*, 438 F.3d at 470.[8]

**Importantly, a defendant's lack of actual knowledge of an intended destination of its goods cannot defeat personal jurisdiction.**  *Id.* at 471.  Thus, Khurana cannot "claim ignorance of the contents of [RK's purchase] orders once their products inevitably reach the intended

---

[8] The Fifth Circuit Court of Appeals has not ruled on a 12(b)(2) motion since the Supreme Court's decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011).  However, District Courts in Texas have indicated that the Fifth Circuit should follow Justice Breyer's narrow concurrence in *McIntyre*.  For example, the Court in *Brooks*, 2011 U.S. Dist. LEXIS 112568 at *10-*11 held in favor of personal jurisdiction by distinguishing the facts from Justice Breyer's central point that "no Supreme Court precedent has concluded that a 'single isolated sale' is sufficient to support jurisdiction." Indeed, Justice Breyer repeatedly emphasized the need to "adhere strictly to our precedents[.]" *McIntyre*, 131 S. Ct. at 2794 (Breyer, J., concurring); *Id.* at 2792 ("resolving this case requires no more than adhering to our precedents," including both pre-*Asahi* decisions and the concurrences in *Asahi*).  Thus, the *Brooks* Court had little difficulty denying a 12(b)(2) motion in accordance with Justice Breyer's *McIntyre* concurrence, finding that one defendant's insertion of the accused products into the stream of commerce, intending for Texas consumers to purchase those products, and the sale of more than one such product in Texas, were sufficient contacts to establish personal jurisdiction over that defendant.  *Brooks*, 2011 U.S. Dist. LEXIS 112568 at *11.

This Court has further clarified the proper stance with respect to the *McIntyre* decision in another case decided on the same day as *Brooks*.  In *Dram Technologies LLC v. America II Group, Inc.*, 2011 U.S. Dist. LEXIS 112532 (E.D. Tex. September 30, 2011), the Court stated that the "plurality opinion by Justice Kennedy [in *McIntyre*] is not the precedential holding of the Supreme Court." *Id.* at *6.  "Under the Rule from [*Marks v. United States*, 430 U.S. 188, 193 (1977)], the concurring opinion by Justice Breyer [in *McIntyre*], which concurs in the Judgment on much narrower grounds, is the binding holding from the Supreme Court." *Dram Technologies*, 2011 U.S. Dist. LEXIS 112532 at *7.

market." *Id.* Moreover, "jurisdiction may attach both to manufacturers who supply their own delivery systems and to those that make use of the distribution systems of third parties." *Id.*

Once a *prima facie* case of minimum contacts is established, taking all of plaintiff's factual assertions in its affidavits and undisputed facts in its complaint in its favor, the Court then engages in an analysis to determine "whether the exercise of jurisdiction would 'offend traditional notions of fair play and substantial justice.'" *Id.* at 473, quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "When a plaintiff makes its *prima facie* case that defendant has 'minimum contacts' with the forum state, the burden of proof shifts to the defendant to show that the exercise of personal jurisdiction would be unreasonable." *Luv n' care*, 438 F.3d at 473. To win, Defendants must make a "'compelling case that traditional notions of fair place and substantial justice would be violated by the exercise of jurisdiction.'" *Newell*, 2009 U.S. Dist. LEXIS 89116 at *4, quoting *Johnston v. Multidata Sys. Intern. Corp.*, 523 F.3d 602, 615 (5th Cir. 2008). The factors to be considered are the burden on the defendant, the forum state's interests, the plaintiff's interest in securing relief, the interest of the interstate judicial system in the efficient administration of justice, and the shared interest of the several states in furthering fundamental social policies. *Luv n' care*, 438 F.3d at 473. "[I]t is not unreasonable to ask [a defendant] to defend in [a forum state] where the company avails itself of the benefit of that state's market for [defendant's] product." *Jackson v. GEHL Co.,* 2009 U.S. Dist. LEXIS 98276, *7 (E.D. Tex. 2009), quoting *Luv n' care*, 438 F.3d at 470.

As will be shown, application of the facts at bar to these well-settled Fifth Circuit principles requires denial of the 12(b)(2) motion.

## II. THE PARTIES PREVIOUSLY AGREED THAT THIS COURT WOULD HAVE PERSONAL JURISDICTION OVER KHURANA

### A. The Settlement Agreement Establishes Personal Jurisdiction Over Khurana

"[T]here are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the Court." *Burger King*, 471 U.S. at 473 n. 14 (1985) (internal quotation marks and citations omitted.) Through contract or agreement, "a party's consent to a court's jurisdiction may take place prior to the suit's institution." *The General Contracting & Trading Co. v. Transamerican Steamship Corp.*, 940 F.2d 20, 22 (1st Cir. 1991), citing *National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 314-15 (1964).

Here, the parties' prior Settlement Agreement provides that the "United States District Court for the Eastern District of Texas, Marshall Division, shall retain sole and exclusive jurisdiction over [Royal King and Luv n' care] ***relating to*** this Settlement Agreement and/or the subject matter of the [Prior Litigation], with that Court retaining exclusive jurisdiction over the enforcement of any and all rights and obligations under this Settlement Agreement."[9] (Dckt. 20-1, ¶ 10) (emphasis added). The terms of the Agreement define the term "Royal King," as including its agents, officers, directors and employees, which includes its then President and current "advisor", Dalbir Khurana. (Dckt. 20-1 , Preamble.)

In fact, Khurana is the very person who negotiated the terms of the Agreement with Luv n' care's CEO. Thus, under the definition of the term "Royal King" set forth in the Agreement and under the Agreement's jurisdictional provision, both the corporate entity and its officer Khurana agreed to jurisdiction in this district for the causes of action herein.

---

[9] Importantly, though Khurana was not an independent party to the Agreement, the Agreement nevertheless governs his actions by specifically defining the party "Royal King" to include its agents, officers, directors and employees, which includes its then President and current "advisor," Khurana. (Dckt. 20-1 , Preamble.) Thus, under the Agreement, both the corporate entity and its officer Khurana agreed to jurisdiction in this district for the causes of action herein.

Indeed, all of Defendants' consequential acts at issue in this complaint **undeniably "relate to"** the Agreement. They are , to wit: Defendants' "illegal copying of Plaintiffs' products"[10] that: a) violates the Agreement; b) interferes with Plaintiffs' existing and prospective contractual and business relations; and c) infringes Plaintiffs' patents; as well as, d) Royal King and Khurana's fraudulent statements made to secure the Agreement. Under the plain, ordinary meaning of the explicit choice-of forum clause of the Agreement, it was agreed that there would be jurisdiction in this Court over the Defendants for the claims in the Amended Complaint.

Though Plaintiffs have alleged some additional causes of action that sound in tortious interference and patent infringement, all of those claims (Counts III – VII) are integrally connected to the breach of contract claim (Count I), whose jurisdiction has been conceded as has been the fraud in the inducement claim (Count II). More specifically, Counts III – VII relate to Defendants' illegal copying and selling of the very same Luv n' care products that breach the Agreement. Thus, all of these claims were contemplated to be included by the parties in their Agreement's choice-of-forum clause.

This reading of the parties' forum selection clause is borne out in the case law. "Whether a particular claim or cause of action falls within the scope of a forum-selection clause is a question of federal law." *Pinnacle Interior Elements, Ltd. v. Panalpina, Inc.*, 2010 U.S. Dist. LEXIS 11067, *15 (N.D. Tex. 2010). Thus, "[t]he scope of a forum selection clause is not limited solely to claims for breach of contract that contains it." *Maxen Capital, LLC v. Timothy Sutherland*, 2009 U.S. Dist. LEXIS 29308, *16 (S.D. Tex. 2009). As is the case here, the forum selection clause at issue in *Maxen* was "broadly written to encompass all claims 'related' to the

---

[10] *See, e.g.* Dckt. 20, ¶ 185 (Count III), ¶ 192 (Count IV), ¶ 210 (Count V), ¶ 218 (Count VI), and ¶ 228 (Count VII).

Agreement."[11]  *Id.*  "Such clauses are broad, 'encompassing all claims that have some possible relationship with the contract, including claims that may only 'relate to' . . . the contract."  *Id.* at *17, quoting *Phillips v. Audio Active Ltd.,* 494 F.3d 378, 389 (2d Cir. 2007); *see also, e.g., Personal Security & Safety Systems, Inc. v. Motorola, Inc.*, 297 F.3d 388, 392 (5th Cir. 2002) (a forum selection clause with "relate to" language "embraces all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute"; *Pennzoil Exploration and Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1068 (5th Cir. 1998).

Significantly, "[t]he courts have held that a contractually-based forum selection clause will also encompass tort claims if those claims . . . involve the same operative facts as a parallel claim for breach of contract." *Maxen*, 2009 U.S. Dist. LEXIS 29308 at *17; *see also Pinnacle*, 2010 U.S. Dist. LEXIS 11067 at *16.  In *Maxen*, the Court held that the forum selection clause at issue applied to all claims in the lawsuit, **including plaintiffs' tortious interference claim**. *Maxen* at *19 (emphasis added).

Revealingly, in their first motion to dismiss, Defendants effectively conceded relatedness between the tortious interference claims and the breach of contract claim in their brief, suggesting that Luv n' care should not be permitted to bring its tortious interference claims on grounds of their redundancy with the contract claim.[12]  (Dckt. 14, p. 15.)  Defendants further

---

[11] The forum selection clause in *Maxen* reads, in relevant part, "Any lawsuit, claim, dispute or other action related to this Agreement must be brought only in an appropriate federal or state court sitting in the Commonwealth of Virginia."  *Maxen*, 2009 U.S. Dist. LEXIS 29308 at *4-*5.

[12] Aside from the misplacement of this argument in a 12(b)(2) motion to dismiss, the assertion of redundancy is incorrect.  Though the causes of action in this instance do share nuclei of operative fact, the scope of a tortious interference claim is different from breach of contract.  Not surprisingly, Defendants have failed to point to any case law that would deny Plaintiffs the right to plead tortious interference claims in addition to and/or in the alternative to a breach of contract claim.

conceded relatedness of the fraud claim, by explicitly conceding personal jurisdiction over RK for the fraud claim under the Agreement's forum selection clause. (Dckt. 14, p. 13.)

Furthermore, the parties elected Texas law to govern the Agreement. *See e.g., Stuart v. Spademan*, 772 F.2d 1185, 1195 (5th Cir. 1985) (choice of law clause "warrant[s] some weight in considering whether a defendant has purposefully invoked the benefits and protection of a state's laws for jurisdictional purposes").

For these reasons personal jurisdiction over Khurana is proper with respect to all claims.

### B. Personal Jurisdiction Over Khurana is Also Proper Because He Personally Negotiated the Settlement and Dismissal of the Prior Texas Litigation

During the prior litigation in this Court, Khurana made statements that resulted in the dismissal of that litigation. Having determined that those statements were fraudulent, Plaintiff has brought the present action against Khurana, with his fraudulent statements forming one of the central bases for this suit. ***Plainly, this Court must have jurisdiction over a defendant with respect to the deliberate fraud he engaged in during a case previously before this very Court.***

Moreover, the parties' Settlement Agreement was fully performed by Plaintiffs. Plaintiffs' dismissal of its causes of action – including its release of Khurana himself in paragraph 8 of the Settlement Agreement – occurred in this forum as <u>a direct result</u> of Khurana's fraudulent statements. Khurana cannot now evade the jurisdiction of this same Court over those statements. He cannot secure the dismissal of a case before this Court by fraudulent statements in that case, *including his own release from any and all potential liability*, and then claim that this Court has no jurisdiction over him with respect to those fraudulent statements.

For this additional reason, personal jurisdiction over Khurana is proper with respect to all claims.

## III. DEFENDANTS' CONTACTS WITH THE STATE OF TEXAS ALSO ESTABLISH SPECIFIC PERSONAL JURISDICTION OVER KHURANA[13]

Royal King is the largest manufacturer of baby products in Thailand. (*See* Graf Decl., Ex. 3.) Since June 2009, the date of the Agreement, Royal King products identified in the exhibits to Plaintiffs' Amended Complaint have appeared in Texas in stores belonging to HEB (a Texas-based company). (Hakim Decl., ¶¶ 3-5, 9-13.) Examples of accused Royal King Products that were purchased in HEB stores in Texas since execution of the Agreement are attached to the Amended Complaint in Exhibits 3, 13, and 19, and are identified therein as products B #22, B #39, B #106, and B #40. (*See also,* Hakim Decl., ¶ 4.) Though in some instances Defendants have avoided marking the packaging of the copied products with the Royal King name (the packaging instead bears private labels), it is clear from the products' resemblance to those in the Prior Litigation, and the fact that the products are indicated on the packaging to have been "made in Thailand," that Royal King is in fact their manufacturer. (Hakim Decl., ¶ 9.) Moreover, additional products that are nearly identical to products sold in the United States have appeared in stores in Peru bearing a Royal King label; Hakim Decl. at ¶¶ 10-12.) For example, Product B #104, a "Dubby" brand product bearing a Royal King label (Dckts. 20-7 and 20-28) is nearly identical to LNC's Product B #68 (Dckt. 20-17, left side of page), which bears a private label. (Not surprisingly, in view of Royal King's history of bad faith, its latest "Dubby" brand mark and/or its willful contribution to the sale of "Dubby" branded products are deliberately intended

---

[13] In his 12(b)(2) motion, Khurana conveniently addresses his contacts with Texas individually and in isolation, instead of in combination. Such a piecemeal approach to personal jurisdiction analysis is improper. A case in point is *Southern Bleacher Co. v. Husco, Inc.*, 2001 U.S. Dist. LEXIS 5911 (N.D. Tex. 2001), heavily relied upon by Khurana in his 12(b)(2) motion. *Southern Bleacher* is inapposite for the simple reason that only a single contact with the state of Texas had been alleged, in stark contrast to the multitude of contacts alleged herein tying Khurana to Texas. *Id.* at 17.

to knock-off Plaintiffs' good will in and to their similar looking and sounding "Nuby" brand mark.)

Furthermore, HEB is a former customer of Luv n' care. (Dckt. 20, ¶ 180; Hakim Decl., ¶ 26.) HEB's continued and expanding relationship with RK through which HEB sells the cheaper knock-offs of Defendants, has effectively ended LNC's relationship with HEB and prevented LNC from forging new agreements or business relations with same. (Dckt. 20, ¶ 183; Hakim Decl., ¶ 29) Since June 2009, Luv n' care has attempted to negotiate additional agreements with HEB, including an offer presented to HEB in December 2009, only to be turned down due to the availability of Defendants' knock-offs. (Dckt. 20, ¶ 195; Hakim Decl., ¶ 28.) Additionally, while LNC continues to sell certain products to TRU and other such companies (in Texas and elsewhere), attempts by LNC to expand these relationships to increase the quantity and variety of products sold have been thwarted, once again by Defendants' offer of the cheaper, illegal copies. (Hakim Decl., ¶¶ 30 – 32.) For example, as Defendants well know, TRU sells the RK products, including those at issue in the AC, in its Texas stores. (Hakim Decl., ¶¶ 6-9) In this way, Defendants have deliberately and effectively interfered with Plaintiffs' existing and prospective contractual and business relations, and have actively induced customers to divert their purchases of Luv n' care products to Defendants' products. Based on Defendants' knowledge of the baby products industry, their awareness of Luv n' care's presence in Texas retail outlets such as HEB and TRU, and Defendants' offer of LNC copies to those retail outlets, it is submitted that Defendants specifically intended to interfere with LNC's business relations with Texas

companies such as HEB, and companies who sell in Texas such as TRU, to harm Plaintiffs in Texas. (Hakim Decl., ¶ 32.)[14]

The illegal copying of these products and the sale thereof to HEB and TRU, as well as Defendants' dealings with these entities to lock out or minimize Luv n' care's presence in stores throughout the United States, **including numerous stores in Texas**, are precisely the acts that constitute substantial portions of the wrongdoing alleged in Counts III – VII of Plaintiffs' complaint. Moreover, it was Khurana, as the President and primary representative of RK with decision-making power, who individually participated and/or directed these activities.[15]

It is thus patently clear that Defendants have, at the very least, breached the Agreement by placing many offending products over the course of multiple years since execution of the Agreement into the stream of commerce,[16] with both the expectation and knowledge (as well as intent) that those products would be sold in Texas and interfere with Luv n' care's business in

---

[14] Khurana's evasive statement in this regard that Defendants are not aware of any contracts or potential contracts between LNC and HEB or TRU (Dckt. 26-1, ¶ 12) further strains credulity given the Prior Litigation in Texas, the pervasiveness of HEB and TRU stores in Texas, and Khurana's admitted participation at baby products trade shows in Texas (Dcket. 26-1, ¶ 3). Khurana spent a significant amount of time in LNC's marketing booth during those JPMA trade shows, interacting directly with LNC's CEO Nouri Hakim regarding their respective businesses, all at a time when LNC was known to be selling its baby products to HEB stores in Texas. (*See*, Hakim Decl., ¶¶ 31-35.)

[15] In response to Khurana's purported search for facts in the AC that point to specific products that tortiously interfere with LNC's contracts and business in Texas (Dckt. 26, p. 13), Plaintiffs direct Khurana to the AC, paragraphs 175 – 224, where Plaintiffs specifically identify RK products sold in Texas that form the basis, in part, of Plaintiffs' tortious interference claims.

[16] In his 12(b)(2) motion, Khurana accuses Plaintiffs of failing to allege facts that the accused products entered the stream of commerce *since* execution of the Agreement. (Dckt. 26, p. 10.) Apparently, in Khurana's view the fact that these products have appeared in stores all over the country since June 2009, and also very recently, (allegations of which are repeated throughout the AC), is insufficient. Rather than simply deny, with supporting facts, that these products have entered the stream of commerce since June 2009, Khurana feels it is Plaintiffs' burden at the pleading stage to prove the affirmative to the point of certainty. Khurana's position is extreme and untenable. Moreover, the fact that Royal King no longer joins Khurana in the 12(b)(2) motion is a further implied admission of Plaintiffs' allegations with respect to the accused products.

Texas, and infringe one or more of Plaintiffs' patents.[17]  Thus, these acts, which are at issue in the AC, along with Khurana's fraudulent statements during negotiation of the Agreement to end the prior Texas lawsuit, specifically arise out of Defendants' contacts with the state of Texas. Accordingly, under both Supreme Court and Fifth Circuit precedent, this Court can exercise personal jurisdiction over Khurana with respect to all claims.  *See e.g., Luv n' care*, 438 F.3d at 473 (manufacturer "should have known, when it availed itself of the [forum's] market for infant care products, that it could face potential liability from competitors with similarly-designed items"; thus, jurisdiction was proper over the manufacturer who sold the products to a major retailer that sold in the forum state); *Ruston*, 9 F.3d at 420-21 (jurisdiction proper in Texas over defendant who "intentionally placed its products into the stream of commerce by delivering them to a shipper destined for delivery in Texas"); *Brooks*, 2011 U.S. Dist. LEXIS 112568 at *11 (jurisdiction proper in Texas over a defendant who "inserted the accused products into the stream of commerce with the intention that the products reach a national market," and more than one sale of the product was made in Texas); *Jacobs Chuck Manufacturing Co. v. Shandong Weida Machinery Co., Ltd.*, 2005 U.S. Dist. LEXIS 36211, *14-*15 (E.D. Tex. 2005) (jurisdiction in Texas proper over Chinese defendant because it was reasonably inferable that defendant knew and expected that the offending product component would be used in drills sold at Home Depot stores (where the drill was known to be sold), which operates stores in Texas).

In light of the above, the 12(b)(2) motion should be denied.

---

[17] Even assuming, *arguendo*, that specific knowledge was lacking, the mere expectation or foreseeability that the offending products would be the sold in Texas is sufficient to confer personal jurisdiction. *Luv n' care*, 438 F.3d at 471.

**IV.    THIS COURT ALSO HAS SPECIFIC JURISDICTION OVER KHURANA FOR THE  FOLLOWING ADDITIONAL REASONS**

**A.    Khurana is *not* Protected by the Fiduciary Shield Doctrine.**

In his 12(b)(2) motion papers, Khurana asserts as a matter of "black letter law" that there can be no jurisdiction over Khurana because he is a corporate representative whose activities directed to Texas were solely on behalf of the corporation.  (Dckt. 26, pp. 7, 10).  Defendants have conveniently avoided addressing a critical exception to this principle.  In particular, the fiduciary shield doctrine does not protect an employee or officer of a corporation from being held personally liable for his own tortious conduct.  *General Retail Servs. v. Wireless Toyz Franchise, L.L.C.*, 255 Fed. Appx. 775, 795 (5th Cir. 2007).  Indeed, a "corporation's employee is personally liable for tortious acts which he directs or participates in during his employment." *Layendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984).  As stated by the Fifth Circuit Court of Appeals, "[i]f a corporate officer knowingly participates in a tortious act, there is no need to pierce the corporate veil in order to impose personal liability."  *Walker v. FDIC*, 970 F.2d 114, 122 (5th Cir. 1992).  "The Fifth Circuit holds that when officers or agents of a corporation direct purposeful, tortious activity towards a particular forum, they are subject to personal jurisdiction in that forum because they should anticipate being hailed into court in that forum." *Lorenzana v. Gulf Coast Marine & Assocs.*, 2010 U.S. Dist. LEXIS 121113, *16 (E.D. Tex. 2010), citing *D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 547 (5th Cir. 1985).  Similarly, "a corporate agent or officer may be held personally liable for fraudulent statements or knowing misrepresentations, even when the statements or representations are made in his capacity as a corporate representative." *See e.g., Ponder Research Group, LLP v. Aquatic Navigation, Inc.*, 2009 U.S. Dist. LEXIS 80654, *20 (N.D. Tex. 2009).  Succinctly stated, ***the fiduciary shield doctrine does not apply to specific jurisdiction***

*inquiries*.  *See, e.g.*, *Bray v. The Cadle Co.*, 2010 U.S. Dist. LEXIS 109470, *37, fn 10 (S.D. Tex. 2010).

Khurana, the President of Royal King at the time in question, who has admitted attending trade shows in Texas to promote RK's baby products, has committed tortious interference, fraud in the inducement and patent infringement, all of which are intentional torts unprotected by the fiduciary shield doctrine or corporate veil.  Khurana's self-serving statements that: (1) he did not place the offending products into the stream of commerce (Dckt. 26-1, ¶¶ 4-6); and (2) he is not aware of contracts between LNC and either HEB or TRU (Dckt. 26-1, ¶ 12) are highly suspect considering the credibility of his declaration as a whole, as well as his position of authority at Royal King.  Indeed, ***Khurana, the President of a baby products manufacturing company that distributes baby products worldwide, who admits participating in baby products trade shows in Texas on behalf of his company (trade shows also attended by LNC), and who was deeply involved in the Prior Litigation in Texas concerning the same LNC products, expects Plaintiffs and the Court to believe that he has never played <u>any</u> role in placing <u>any</u> Royal King Products into the stream of commerce, and had no knowledge of Plaintiffs' sales of baby products to Texas retailers***.  Plaintiffs are not, nor should the Court be, persuaded by such obviously questionable, self-serving and conclusory assertions.

Moreover, Khurana has not denied that the products at issue here are sold in Texas.  Nor has he denied that he has tortiously interfered with Plaintiffs' customers, such as HEB, which is based in Texas, both by inducing termination of existing contracts and business relations, and by thwarting further attempts by Luv n' care to contract and establish further relationships.  Khurana, knowing the baby products industry and Luv n' care's presence in Texas through his

trips to the state and from the Prior Litigation, intended his interference to specifically cause harm to Plaintiffs in the state of Texas.

With respect to the fraud claim, Khurana does not deny making the numerous statements regarding Royal King's revenues in the negotiations leading up to the Agreement – the statements alleged herein to be fraudulent.[18]  Those fraudulent statements resulted in particular terms for mutual release and payoff as part of the Agreement that bound – and released – not just the signatories, but also Khurana himself.  (Dckt. 20-1, Preamble and ¶ 8.)  Khurana also consulted with Texas counsel with respect to those negotiations and shared the same fraudulent representations both with his Texas counsel and this Court.  (Dckt. 20, ¶ 5; Hakim Decl., ¶ 17 and Exhibit 1.)

Indeed, Khurana would have this Court hold that it has no jurisdiction over him to adjudicate fraudulent representations that he made in the context of a prior lawsuit <u>before this very Court</u>.  Khurana's self-serving and plainly inequitable position should be rejected in its entirety.

In light of the above, Khurana is properly subject to this Court's jurisdiction for Claims II – VII.  *See e.g., Bollinger Industries, L.P. v. May*, 2003 U.S. Dist. LEXIS 25137, *11-*12 (N.D. Tex. 2003) (*personal jurisdiction proper of non-resident president of a corporation (May) for tortious interference with existing and prospective contracts because tortious interference is an intentional tort and May was aware that his company's interference would cause injury in Texas based on May's business dealings with plaintiff on behalf of May's company*); *Credit Checque*

---

[18]  Khurana instead makes a bald, hardly surprising assertion, without pointing to a single supporting financial document, that he "did not make any misrepresentation of Royal King's sales or revenue numbers during settlement talks for the prior litigation."  (Dckt. 26-1, ¶ 13.) Not only is the veracity of this conclusory statement questionable for reasons already stated, it is not relevant to a 12(b)(2) motion on personal jurisdiction; moreover, as discussed *infra*, it is likewise not relevant to a 12(b)(6) motion.

*Corp. v. Zerman*, 1997 U.S. Dist. LEXIS 20365, *12-*13 (N.D. Tex. 1997) (*personal jurisdiction proper over non-resident president of a corporation (Zerman) for tortious interference with contract claim because plaintiffs alleged Zerman purposefully directed tortious activity toward Texas and Zerman was not protected by fiduciary shield because tortious interference is an intentional tort*); *Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1189-90 (5th Cir. 1984) (*out-of-state acts of tortious interference with contractual relations by corporation's agent giving rise to tortious injury in forum state enough to warrant personal jurisdiction over the agent*); *Auto Wax Co., Inc. v. Marchese*, 2002 U.S. Dist. LEXIS 12758, at *3 (N.D. Tex. 2002) (*intentional infringement of patent by individual corporate officer precludes fiduciary shield defense*); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 974 (5th Cir. 1984) (personal jurisdiction proper over non-resident corporate agent or employee because of a "foreseeable consequence [in the forum state] of his personal act performed elsewhere, although allegedly performed only as a corporate functionary"); *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 333-34 (5th Cir. 1982) (single defamatory phone call by corporation's president sufficient to create personal jurisdiction over the president); *Carrot Bunch Co., Inc. v. Computer Friends, Inc.*, 218 F. Supp.2d 820, 826 (N.D. Tex. 2002) (in trademark infringement action, specific jurisdiction over nonresident corporate officer proper based on interactive website, where officer directed his tortious activities toward the forum state by registering and using domain names that infringed Plaintiff's trademark).[19]

---

[19] Jurisdiction over an individual corporate officer or director is also proper when the corporation is the "alter-ego" of the officer or director. *Beagles and Elliott Enterprises, LLC v. Florida Aircraft Exchange, Inc.* 70 Fed. Appx. 185, 187 (5th Cir. 2003). To determine alter-ego status, the Court looks to such factors as degree of control exercised by the officer, commingling of funds, observance of corporate formalities, whether the corporation is adequately capitalized, and whether the corporation transacts the officer's personal business. *Id.* Khurana's self-serving declarations, in which he makes unsupported statements regarding these factors (Dckts. 14-1 and

## B. Personal Jurisdiction Over Khurana For Counts III – VII is Proper Pursuant to the Doctrine of Pendent Personal Jurisdiction.

Pendent personal jurisdiction enables a court to confer personal jurisdiction over a defendant with respect to one or more claims by virtue of the Court's jurisdiction over that defendant for another claim. *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008). "In essence, once a district court has personal jurisdiction over a defendant for one claim it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all claims arise from the same facts as the claim over which it has proper personal jurisdiction." *Id.* (internal quotation marks and citations omitted. "Although the Fifth Circuit has not yet addressed this doctrine of federal common law, the Tenth Circuit has noted that every circuit court to decide the issue has approved pendent personal jurisdiction." *Id.*, citing *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002)). The reasons for wide support of the doctrine are self-evident: pendent personal jurisdiction "serves the interest of judicial economy," and once a defendant is already before the court to defend one claim, it would be unusual for the same defendant to experience substantial hardship if forced to litigate a similar or related claim. *See Rolls-Royce*, 576 F. Supp. 2d at 785.

Thus, even assuming, *arguendo*, personal jurisdiction over Khurana were not proper for Counts III – VI (it is), it would be appropriate for the Court to nevertheless exercise pendent

---

26-1, ¶ 9), are conclusory, and also dubious in view of Khurana's other statements made therein. Thus, although Plaintiffs firmly believe Defendants should be denied their motions, in the event that the Court believes that further factual evidence should be developed, Plaintiffs respectfully request leave to conduct limited discovery on these issues prior to a ruling on the motions to dismiss, permitting Plaintiffs to investigate RK's corporate structure, Khurana's relationship with RK, as well as RK's and Khurana's specific and general contacts with the State of Texas (followed by leave to further amend their complaint). Included in such a discovery period, Plaintiffs would request taking the deposition of Khurana with respect to these issues.

personal jurisdiction for these claims, in view of these claims' shared nucleus of operative fact with that of the patent infringement claim (Count VII).

Jurisdiction over Khurana for Count VII (patent infringement) is perfectly straightforward. Several of the products at issue infringe LNC's U.S. Patent No. D634,439 (the "439 Patent"). (Dckt. 20, ¶ 37; Dckt. 20-3.)[20] At least some of the infringing products have been sold in Texas since the Agreement. For example, RK Product B#22 (Dckt. 20-3) has been purchased at an HEB store in Texas since execution of the Agreement. (Hakim Decl., ¶¶ 3-4; Dckt. 20, ¶ 48.) Under well-settled Fifth Circuit and Texas law, these facts alone establish personal jurisdiction over Khurana – who directly participated in and/or sanctioned these illegal sales – for Claim VII. *Litepanels, LLC v. Gekko Tech., Ltd.* (2006 U.S. Dist. LEXIS 75017, *6 (E.D. Tex. 2006) (in a patent infringement lawsuit, "[b]ecause patent infringement is a tort, and [the] alleged infringement happened in the Eastern District [of Texas], and [defendant] put its product into the stream of commerce with the intent that it would be available to people in the United States and Texas, [defendant] has sufficient minimum contacts to establish specific jurisdiction"; *Westerngeco L.L.C. v. Ion Geophysical Corp.*, 776 F. Supp. 2d 342, 356 (S.D. Tex. March 2, 2011) ("[i]n a patent infringement case, specific jurisdiction over a foreign defendant may be proper if the defendant sells the infringing item to customers in the forum state.")

As set forth above, it is the same nucleus of operative facts (Defendants' manufacture and sale of baby products in breach of the Agreement), that underlies both Defendants' infringement of the '439 Patent and Defendants' tortious interference. Thus, under the doctrine of pendent

---

[20] Defendants once again in their desperation to avoid the merits of this case have blatantly misstated the facts. Defendants assert that LNC "completely fails to identify even a single Royal King product that infringes any patent claim." (Dckt. 27, p. 11; *see also* Dckt. 26, p. 14.) One wonders whether Defendants even bothered to read the Amended Complaint. (*See,* Dckt. 20, ¶ 37, specifically identifying RK products that infringe the '439 Patent.)

personal jurisdiction, jurisdiction over Khurana is proper with respect to Counts III – VI.  *See, e.g., Oetiker v. Jurid Werke, G.m.b.H.,* 181 U.S. App. D.C. 124, 556 F.2d 1, 4-5 (D.C. Cir. 1977) (***personal jurisdiction proper over state claims arising from same operative facts as patent claim, for which personal jurisdiction was proper under the federal patent statute***); *see also, e.g., Inspirus, L.L.C. v. Egan*, 2011 U.S. Dist. LEXIS 107493, *16 (N.D. Tex. 2011) (pendent jurisdiction proper over tortious interference claims because they arose from the same nucleus of operative fact upon which plaintiff based its breach of contract claim; jurisdiction over the breach of contract claims was proper pursuant to a forum selection clause; defendant breached a confidentiality agreement containing the forum selection clause by using confidential information to usurp existing and prospective business of plaintiff); *Rolls-Royce*, 576 F. Supp. at 784-85 (pendent jurisdiction proper over tortious interference claim that shared same "wrongful conduct element" with RICO claim for which jurisdiction was proper).

For this additional reason, personal jurisdiction over Khurana is proper with respect to Counts III – VI.

> **C.    Personal Jurisdiction Over Khurana For Count II is Also Proper Because of Defendants' Consent thereto.**

As set forth above, Royal King has consented to this Court's jurisdiction for purposes of Count II for fraud in the inducement.  Khurana committed the fraud as both a representative of RK, and in his own personal capacity.  Because of the nature of this wrongdoing, Khurana is not protected by the fiduciary shield, as discussed above.  Accordingly, RK's consent to jurisdiction necessarily imputes to Khurana.  ***Any other conclusion would be totally illogical and***

***unreasonable, and would result in two lawsuits in different forums, each one litigating the***

***same fraudulent statements by Khurana.***[21]

For this additional reason, personal jurisdiction over Khurana is proper with respect to Count II of the AC.

## V. EXERCISING PERSONAL JURISDICTION OVER KHURANA IS CONSISTENT WITH DUE PROCESS

In view of: (1) the terms governing jurisdiction of the Agreement that closed the Prior Litigation; (2) the history of the Prior Litigation; (3) Khurana's substantial and specific contacts with the State of Texas; (4) Khurana's attendance at trade shows in the state; (5) Defendants' consent to jurisdiction over the breach of contract and fraud claims herein; and (6) the injuries suffered by Plaintiffs in Texas through the sale of multitudes of the alleged products throughout Texas as a result of the acts of Defendants alleged in the AC, Defendants have failed to overcome their heavy burden to establish that this court's exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *See Johnston v. Multidata Sys. Intern. Corp.*, 523 F.3d 602, 615 (5th Cir. 2008). The case law firmly supports a finding that due process is not offended by Khurana being hailed into this Court to litigate this case. "[W]here a product allegedly causes economic injury in [the forum state], it is in the interest of that state to have its courts mediate the dispute." *Luv n' care*, 438 F.3d at 473. Indeed, "Texas, as forum state . . . has an interest in adjudicating a dispute that involves sale of goods to a Texas consumer[.]" *Ruston*, 9 F.3d at 421. "It is not unfair or unjust to require the manufacturer of a good that is

---

[21]  Moreover, as a matter of law, the statements can be litigated here, even assuming *arguendo* that they are deemed to have been made elsewhere despite the fact that they were made in the context of litigation in this forum. *See e.g., Donovan*, 747 F.2d at 974 (5th Cir. 1984) (due process not offended "when a non-resident corporate agent or employee is made subject to personal jurisdiction in the forum state for a foreseeable consequence therein of his personal act performed elsewhere, although allegedly performed only as a corporate functionary.")

knowingly delivered to a specific state to respond to a lawsuit arising out of defects in the good in that state." *Id.* "Texas has a significant interest in discouraging injuries . . . that occur within the state." *Jacobs Chuck Manufacturing*, 2005 U.S. Dist. LEXIS at *27 (injury in state was patent infringement).

Furthermore, travel to Texas from Thailand for Khurana carries little if any weight in view of advances in travel and communications technology. *Jacobs Chuck Manufacturing*, 2005 U.S. Dist. LEXIS at *26-*27 (burden on Chinese defendant to travel to Texas minimal in view of modern travel and communications; motion to dismiss under Rule 12(b)(2) denied). This factor's significance is diminished further in light of Royal King's consent to jurisdiction with respect to all claims; as the former President of Royal King, and the person who negotiated the Agreement on Royal King's behalf, Plaintiffs will undoubtedly call upon Khurana to testify on each and every claim in the case against Royal King.[22] *See Bollinger*, 2003 U.S. Dist. LEXIS 25137 at *13 (due process not offended in subjecting non-resident president of corporation to court's jurisdiction in part because, even if dismissed, he would "likely continue to participate in [the] litigation . . ."); *X-Tra Light Manufacturing Partnership, Ltd. v. Midwest Illumination, Inc.* 2007 U.S. Dist. LEXIS 10513, *13-*14 (S.D. Tex. 2007) (personal jurisdiction over non-resident CEO of corporation supported by CEO's inevitable role in the case and presence at trial, whether or not he is a party).

---

[22] Defendants' "policy" argument (Dckt. 26, pp. 2, 16) that exercising personal jurisdiction over Khurana would have a chilling effect on international settlement agreements is neither supported in case law, nor sensible. In Defendants' view an individual who resides overseas may make bold-faced, material lies during settlement negotiations with a US-based litigant with total impunity. Furthermore, Defendants imply elsewhere in their brief that Louisiana would be an appropriate forum to adjudicate the fraud claim against Khurana (Dckt. 26, p. 6), a position that completely undermines their own policy argument.

Taken together, the significant interests of both Plaintiffs and the State of Texas –
including this State's and this Court's considerable interests in adjudicating fraudulent conduct in
a prior litigation before this Court – all resolve the due process inquiry in Plaintiffs' favor.  *Luv
n' care,* 438 F.3d at 474.  For all of the above reasons, the 12(b)(2) motion should be denied.

## VI.  DEFENDANTS' 12(b)(6) MOTION IS MERITLESS

### A.  Legal Standard Governing the 12(b)(6) Motion.

"A motion to dismiss under rule 12(b)(6) is viewed with disfavor and is rarely granted."
*Harrington v. State Farm Fire & Casualty Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (internal
quotation marks and citations omitted).  To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs
need only plead "a short and plain statement of the claim showing that the pleader is entitled to
relief." Fed. R. Civ. P. 8(a)(2).  "'[D]etailed factual allegations are not required.'"  *Ashcroft v.
Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 555, 127 S. Ct. 1955 (2007)).  The complaint must be construed "liberally in favor of the
plaintiff" and the Court must take "all facts pleaded in the complaint as true."  *Harrington*, 563
F.3d at 147.  This "strict" standard of inquiry can be summed up as "whether in the light most
favorable to the plaintiff and with every doubt resolved on his behalf, the complaint states any
valid claim for relief."  *Id.* (internal quotation marks and citations omitted).  A claim should not
be dismissed under Rule 12(b)(6) "unless the court determines that it is beyond doubt that the
plaintiff cannot prove a plausible set of facts that support the claim and would justify relief."
*Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008), citing *Bell Atlantic Corp.* 127 S. Ct. at
1965-66.[23]

_____

[23] In the (12)(b)(6) motion, ***Defendants have not adequately denied a single salient allegation
in Plaintiffs' amended complaint***.  The closest they come to any statement remotely resembling
a denial is their obscure reference to the transcript from a status conference in a case involving

## B. Plaintiffs Have Adequately Pled a Claim for Breach of Contract.

For purposes of a 12(b)(6) motion to dismiss a breach of contract claim, Plaintiffs need only plead the following four elements: (1) existence of a valid contract; (2) Plaintiffs' performance under the contract; (3) Defendants' breach of the contract; and (4) Plaintiffs' damages suffered as a result of the breach. *Hoffman v. L&M Arts*, 774 F. Supp. 2d 826, 832 (N.D. Tex. 2011), citing *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003).

In their brief, Defendants contest the proper pleading of element (3) alone. (Dckt. 27, p. 7). However, Plaintiffs have adequately pled each and every one of the four required elements for breach of contract. (Dckt. 20, ¶ 153 (element 1), ¶ 154 (element 2), ¶¶ 155-158 (element 3), ¶ 154 (element 4).)

Moreover, the AC is replete with unrefuted facts specifically showing RK's breach of the Agreement, identifying specific products that violate the Agreement and that have been sold by

---

one of Royal King's distributors, Regent Baby Products, Inc., ("Regent"), a case which involves trade dress and patent infringement, and unfair competition with respect to illegally copied baby products, at least some of which are manufactured by Royal King and distributed by Regent. The purported inference RK seeks to draw from that conference fails for a number of reasons. First, during that status conference, counsel for Luv n' care indicated that, subject to adequate proof *in the future (which it was still awaiting)*, LNC would be willing to drop one item from the Regent case *with respect to its claim for patent infringement only*, provided that Regent could prove that they did not sell their item *after* the issuance of the patents at issue in that case. (Dckt. 27-1, 18:15-22; 19:4-13.) LNC's counsel's statement is thus immaterial to this case because the patents alleged in the Regent case issued on June 8, 2010, and March 15, 2011, respectively (Dckts. 20-31 and 20-32), long after LNC and RK settled the Prior Litigation. Whether or not a particular distributor, Regent, sold the RK products after June 2010, has no bearing on whether Royal King continued to sell the accused products after execution of the *June 2009* Settlement Agreement. Second, Luv n' care's conditional concession in the Regent case is with respect to Regent products only and has no implication with respect to that particular RK item sold by other distributors and retailers, or any of the other products alleged in the AC in this case. Third, it relates to one product only, and has no bearing upon the sales of any of the other accused products in this case. Finally, and perhaps most importantly, neither RK nor Regent *has denied their continued sales since execution of the Agreement of more than 50 products alleged in the Amended Complaint, much less all of them as it must*.

Defendants since the Agreement was signed.  Plaintiffs have even supplied facts supporting their allegations that the products at issue are in fact Defendants' products.

In response, rather than deny these facts and factual allegations, Defendants just recite over and over again that the AC does not contain facts.  Despite admitting that all but two of the alleged products in the AC are RK products[24], Defendants decide to put the onus on Plaintiffs to **prove** in their Complaint that the fifty-plus other products actually left the hands of RK since the Settlement Agreement, as opposed to appearing on shelves from the stores' pre-June 2009 inventory. (Dckt. 27, p. 4.)  If that were truly the case, it would be easy enough for RK to just assert, with supporting documentation, that each and every one of the RK products **alleged in the AC** has not been sold by RK since execution of the Agreement; but RK does not do so, because it cannot do so.

Instead, Khurana makes a delicate legal conclusion in his "factual" declaration that is designed to **sound** far more encompassing than it actually is.  In reality, Khurana's statement in paragraph 11 of his Declaration (Dckt. 26-1) that Defendants have not sold "any of the products covered by the Settlement Agreement" since the signing thereof, is an artfully composed, but completely meaningless statement (aside from being the epitome of conclusory and self-serving). This case is not about the exact RK products at issue in the Prior Litigation.  It is about **later** "**versions of [those] Products or their packaging that are likely to cause confusion with LNC's products or packaging.**" (Agreement, Dckt. 20-1, ¶ 6 (emphasis added).) This is the clause of the Agreement that RK has breached.  Khurana may have a personal opinion as to whether the RK products alleged in the AC are likely to cause confusion with LNC's products under the

---

[24] This assertion of Khurana is suspect to the say the least, given his numerous statements under penalty of perjury that are less than forthright, and further due to the fact that these two specific products (B #4 and B #8) are identical or highly similar to products that were accused in the Prior Litigation.

language of the Agreement, but he has no right to artificially convert such an opinion into a fact that facially supports his own motion to dismiss.

Defendants' 12(b)(6) motion with respect to Claim I is thus utterly meritless and must be denied.

### C. Plaintiffs Have Adequately Pled a Claim for Fraud in the Inducement.

A claim for fraudulent inducement has six elements:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation, and (6) the party thereby suffered injury.

*Lane*, 529 F.3d at 564 (internal quotation marks and citations omitted). Under Fed. R. Civ. P. 9(b), circumstances constituting fraud must be pled with particularity, while "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Where information about individual false claims lies peculiarly with the perpetrator of the fraud, the requirements of Rule 9(b) are relaxed, and the plaintiff may plead such information upon information and belief. *U.S. ex. rel. Hebert v. Dizney*, 295 Fed. Appx. 717, 723 (5th Cir. 2008). This exception is particularly applicable in "cases of corporate fraud where the plaintiff cannot be expected to have personal knowledge of the facts constituting the wrongdoing." *U.S. ex rel. Thompson v. Columbia*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998). One purpose behind this exception is to prevent sophisticated defrauders from successfully concealing the details of their fraud by avoiding discovery. *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Plaintiffs have pled each of the six elements for fraud in the inducement with the requisite particularity. During negotiations to settle the Prior Litigation, Khurana represented to Nouri E. Hakim, CEO of Luv n' care, that RK's total worldwide revenues from sales of the accused products in the Prior Litigation amounted to $3.3 million (of which $2.3 million in sales were said to have taken place in the U.S. and another $1 million internationally). (Dckt. 20, ¶ 163.) This representation was made by Khurana to Mr. Hakim numerous times and the Amended Complaint recites specific dates on which these representations were made. (Dckt. 20, ¶ 29; Hakim Decl., ¶¶ 14-18 and Ex. 1.) These representations were material, as they induced Plaintiffs to settle the Prior Litigation for significantly less than they were entitled to, as RK had agreed to pay Plaintiffs a 12% royalty on its worldwide sales of the products at issue. (Dckt. 20, ¶¶ 165-167.) These representations were false, based on evidence that has been developed since execution of the Agreement regarding RK's sales at issue in the Agreement, from which it can be directly inferred that RK's revenues for the relevant products prior to the Agreement in the U.S. substantially exceeded RK's representations. (Dckt. 20, ¶ 19.) That these representations were false can be inferred, for example, from discovery produced in other litigations against RK's distributors and retailers concerning the sales numbers of some of the exact same products at issue in the Prior Litigation. (Dckt. 20, ¶¶ 30-32.)[25] Importantly, the documents that would affirmatively prove the falsehood of these representations are within the possession of Defendants, and Plaintiffs have no alternative access to such documents but through discovery or

---

[25] In view of these allegations in the AC, Defendants' insistence that Plaintiffs have presented not even a "scintilla of evidence" on the falseness of Khurana's statements (Dckt. 27, pp. 6-7) is truly perplexing. Now, rather than supply facts refuting Plaintiffs' clear factual allegations of falsity, Khurana, in a torrent of hypocrisy, resorts to a simple, conclusory, utterly self-serving statement that he "did not make any misrepresentation of Royal King's sales or revenue numbers during settlement talks for the prior litigation." (Dckt. 26-1, ¶ 13.) This unadorned, unsubstantiated statement, aside from being unsupported, is as suspect as any other in his declaration for the reasons described above.

court order.  Accordingly, it is sufficient that the falsehood can be inferred. (Dckt. 20, ¶ 33.)  *See e.g., U.S. ex. rel. Hebert*, 295 Fed. Appx. at 723.  Khurana's state of mind in making these false representations need only be generally alleged (Fed. R. Civ. P. 9(b)), which Plaintiffs have adequately done.  (Dckt. 20, ¶ 32, 167-169.)  Finally, specific factual allegations of Plaintiffs' reliance on these representations (settling the Prior Litigation) and injury suffered from that reliance (substantially reduced royalty payment) are repeated throughout the AC.  (*See e.g.*, Dckt. 20, ¶¶ 173-174.)

Accordingly, the 12(b)(6) motion with respect to Claim II must be denied.

**D.    Plaintiffs Have Adequately Pled Claims for Tortious Interference with Existing and Prospective Contractual and Business Relations.**

To adequately state a claim for tortious interference with existing contractual or business relations, Plaintiffs need only allege (1) the existence of a contract/business relationship subject to interference; (2) willful and intentional interference by the third party; (3) interference that proximately caused the damage; and (4) actual damage or loss.  *See e.g.*, *ED&F Man Biofuels, Ltd. v. MV Fase*, 728 F. Supp. 2d 862, 867 (S.D. Tex. 2010).  To adequately establish intent, it is enough to show "'knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship.'" *Amigo Broad., LP v. Spanish Broad. Sys.*, 521 F.3d 472, 490 (5th Cir. 2008), quoting *Steinmetz & Assocs., Inc. v. Crow*, 700 S.W.2d 276, 277-78 (Tex. App. 1985).

Likewise, to adequately state a claim for tortious interference with prospective contractual or business relations, Plaintiffs need only allege:

> (1) a reasonable probability that the plaintiff would have entered into a business relationship, (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring, (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the

interference was certain or substantially certain to occur as a result of the conduct, and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference.

*VendEver LLC v. Intermatic Mfg.*, 2011 U.S. Dist. LEXIS 105257, *16-*17 (N.D. Tex. 2011). It is sufficient to allege facts that raise a "reasonable expectation that discovery will reveal evidence of the necessary elements of tortious interference." *Fisher v. Blue Cross Blue Shield*, 2011 U.S. Dist. LEXIS 86165, *9-*10 (N.D. Tex. 2011). Factual allegations of existing contracts and business relationships with a class of third parties can be properly extrapolated to include prospective contracts and business relations within that class. *Kinetic Concepts v. Bluesky Med. Corp.*, 2005 U.S. Dist. LEXIS 32212 (W.D. Tex. 2005), *10 - *11.

Generally, "[t]o show tortious interference, a plaintiff is not required to prove intent to injure, but rather 'only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Amigo Broad.,* 521 F.3d at 490, quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992). A defendant's willfulness or conscious desire can be inferred from factual allegations in the complaint that are not specifically directed to the issue of intent. *See VendEver*, 2011 U.S. Dist. LEXIS 105257 at *18 - *19. At the pleading stage, before discovery, it is enough to allege circumstantial factual support of tortious interference. *Farouk Sys. v. Costco Wholesale Corp.*, 700 F. Supp. 2d 780, 785 (S.D. Tex. 2010).

Plaintiffs have pled all necessary elements of tortious interference with existing and prospective contractual and business relations, and they have met their extremely low pleading-stage burden with respect to alleging supporting facts. Plaintiffs have alleged specific existing contracts with customers such as HEB and TRU, and attempts at, and a high probability of, future contractual and business relations with customers such as HEB and TRU, including details

surrounding these attempts and probabilities. (*See* Dckt. 20, generally, ¶¶ 175 – 224.) Plaintiffs have further alleged a specific example of a hard top sippy cup product which, but for Defendants' sale of a cheap knock-off to TRU, Plaintiffs would have likely succeeded in adding to their line of TRU-retailed products. (Dckt. 20, ¶¶ 197-198.) Plaintiffs have also alleged specific examples of LNC product lines that TRU used to carry until they replaced the LNC products with cheaper, inferior, RK knock-offs. (Dckt. 20, ¶ 181.)

With respect to the tortious nature of Defendants' acts, Plaintiffs have alleged unlawful copying and patent infringement. (Dckt. 20, ¶¶ 185, 192, 210, 218.)

Defendants' state of mind and intent in interfering with Plaintiffs' customers can be inferred from Defendants' knowledge and awareness of the baby products industry, and their knowledge and awareness of the LNC baby products that have been sold and/or are presently sold at stores such as HEB and TRU. (Dckt. 20, ¶¶ 183, 199, 207, 221.)[26] At this stage of the litigation, such an inference satisfies Plaintiffs' low burden. *See e.g., Farouk.*, 700 F. Supp. 2d at 785.

Finally, the damage to Plaintiffs proximately resulting from Defendants acts of interference has also been adequately alleged, in that the Defendants' sale of cheap knock-offs to the likes of HEB and TRU have terminated and/or prevented lucrative agreements and/or business relations with Plaintiffs' customers concerning those same products. (AC, ¶¶ 188, 202, 214, 224.)

---

[26] Once again, Khurana's self-serving conclusory statement denying awareness of LNC's contracts with HEB and TRU (Dckt. 26-1, ¶ 12) is evasive and suspect. At the very least, his awareness of some sort of commercial relationship between LNC and these other companies is both readily inferable from his actions and consistent with his subtly non-committal assertion in his declaration. Furthermore, it is improper for Defendants to rely on Khurana's declaration in their 12(b)(6) motion. *See, e.g., Dillon v. Rogers*, 596 F.3d 260, 271 (5th Cir. 2010) (in analyzing a 12(b)(6) motion, if the court considers evidence outside the pleadings the motion must be converted to one for summary judgment).

Accordingly, the 12(b)(6) motion with respect to Counts III – VI must be denied.

### E.        Plaintiffs Have Adequately Pled a Claim for Patent Infringement

Defendants' only issue with Plaintiffs' allegations concerning the '439 Patent (the patent currently in suit), is their frantic assertion, in an all-out effort to dismiss the entire case no matter how baseless the grounds, that Plaintiffs have not identified any RK products that infringe the '439 Patent. (Dckt. 27, p. 11.)  This is false.  Plaintiffs specifically identify RK products that infringe the '439 Patent.  (*See,* Dckt. 20, ¶ 37, specifically identifying RK products that infringe the '439 Patent.)

Plaintiffs have not yet alleged infringement of U.S. Patent No. D617,465 (the "465 Patent") in this lawsuit.  The '465 patent claims the same sippy cup top as the '439 Patent, as well as a sippy cup itself.  Plaintiffs are reserving the right to amend the complaint, to the extent permissible, to add the '465 patent to their claims.  Hardly seeking license to go on a "fishing expedition," this is a perfectly reasonable reservation in view of Defendants' large, global range of products and habitual piracy, and the attendant likelihood that an infringement of the '465 patent will turn up during the course of discovery in this lawsuit.  Moreover, leave to amend a complaint prior to trial should be freely granted.  Fed. R. Civ. P. 15(a).

Accordingly, the 12(b)(6) motion with respect to all claims is without merit and should be denied.

### CONCLUSION

For the above reasons, Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(2) and 12(b)(6) are without merit and should be denied in their entirety.

Dated:  February 6, 2012                    Respectfully submitted,

By:     /s/ Morris E. Cohen            
        Morris E. Cohen (Member of the Bar, E.D. Texas)
        Lee A. Goldberg (for *pro hac vice*)
        Benjamin H. Graf (for *pro hac vice*)
        GOLDBERG COHEN LLP
        1350 Avenue of the Americas, 4th flr.
        New York, New York 10019
        (646) 380-2087 (phone)
        (646) 514-2123 (fax)
        MCohen@GoldbergCohen.com
        LGoldberg@GoldbergCohen.com
        BGraf@GoldbergCohen.com

        Of Counsel:

        Joe D. Guerriero (Member of the Bar, E.D. Texas)
        Luv n' care, Ltd.
        3030 Aurora Avenue
        Monroe, Louisiana 71201
        318-338-3603 (phone)
        318-388-5892 (fax)
        joed@luvncare.com

        Attorneys for Plaintiffs Luv n' care, Ltd. and Admar
        International, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS UNDER FRCP 12(b)(2) AND 12(b)(6), DECLARATION OF BENJAMIN H. GRAF IN OPPOSTION TO DEFENDANTS' MOTIONS TO DISMISS UNDER FRCP 12(b)(2) AND 12(b)(6), DECLRATION OF NOURI E. HAKIM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS UNDER FRCP 12(b)(2) AND 12(b)(6),** was served via the Court's ECF system on counsel of record for Defendant on this 6th day of February, 2012.  Accordingly, pursuant to Local Rule CV-5, said document has been served on all counsel deemed to have consented to electronic service.

*/s/ Sherika Sterling*_____
Sherika Sterling