IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| LUV N' CARE, LTD. and ADMAR INTERNATIONAL, INC., <br><br> Plaintiffs, Counter-Defendants <br><br> v. <br><br> ROYAL KING INFANT PRODUCTS CO. LTD., <br><br> Defendant, Counter-Plaintiff. | § § § § § § § § § § § § § § Civil Action No. 2:10-cv-00461-JRG-RSP |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Royal King Infant Products Co., Ltd.'s ("Royal King" or "Defendant") affirmative defense of equitable estoppel and claim for fraudulent inducement. On November 4, 2010, Plaintiffs Luv N' Care, Ltd. and Admar International, Inc. (collectively, "Luv N' Care" or "Plaintiffs") brought suit against Royal King alleging breach of contract, fraud in the inducement, tortious interference with existing and prospective contractual or business relations, and patent infringement[1]. (Dkt. No. 20.) In response, Royal King raised a number of affirmative defenses including equitable estoppel and statutes of limitation. (Dkt. No. 116.) Royal King also counterclaimed accusing Luv N' Care of breach of contract, tortious interference with existing and prospective contractual or business relations, and fraud in the inducement. (*Id.*)

On October 7, 2013, the Court granted Royal King's Motion for Partial Summary Judgment on Luv N' Care's fraud in the inducement claim, holding that Luv N' Care's claim is barred by the one-year prescriptive period under La. Civ. Code art. 3492. (Dkt. No. 192.)

---

[1] On May 10, 2013, the Court stayed Luv N' Care's patent infringement claim pending reexamination of the patent in suit. (Dkt. No. 89.)

The Court conducted a jury trial beginning on October 7, 2013, in regard to Luv N' Care's claims for breach of contract and intentional interference against Royal King, as well as Royal King's claims for breach of contract and intentional interference against Luv N' Care. In the parties' Joint Final Pretrial Order, Royal King agreed to have its fraud in the inducement claim decided by the Court, to which Luv N' Care failed to timely object. (*See* Dkt. No. 158 at 16; Dkt. No. 213 at 2-3.)

On December 4, 2013, the Court held a bench trial to hear further evidence presented solely with respect to Royal King's fraud in the inducement claim. (*See* Dkt. No. 213.) The Court also heard arguments relating to Royal King's equitable estoppel defense. (*See* Dkt. No. 213 at 3-4; Dkt. No. 198 at 1.) The parties submitted their respective trial briefs prior to the bench trial. (*See* Dkt. Nos. 216, 221.) The Court having considered the same now makes and enters the following findings of fact and conclusions of law relating to Royal King's fraud in the inducement claim and defense of equitable estoppel.[2]

## I. FINDINGS OF FACT

### a. The Parties

1. Plaintiff Luv N' Care, Ltd. is a Louisiana corporation with its principal place of business in Monroe, Louisiana. At least some of the Luv N' Care products at issue in this case are manufactured either in China or India. (Joint Final Pretrial Order, Dkt. No. 220 at 12.)

2. Plaintiff Admar International, Inc. is a Delaware corporation with its principal place of business in Monroe, Louisiana. Admar is an affiliate of Luv N' Care that holds the rights to Luv N' Care's trademarks. (*Id.*)

3. Mr. Eddie Hakim is the principal of Luv N' Care and Admar. (*Id.* at 13.)

---

[2] Pursuant to the parties' joint request, the Court hereby takes judicial notice of all the evidence that was already presented in the jury trial and the undisputed facts listed in the parties' Joint Pretrial Order For Second Phase of Trial. (*See* 12/4/2013 Trial Tr. at 125:17-126:7; Dkt. No. 220.)

2

4. Defendant Royal King is a corporation in Thailand, with its principal place of business in Bangkok, Thailand. Royal King manufactures at least some of its products at its factory in Thailand. (*Id.*)

5. Luv N' Care and Royal King are baby products companies that sell baby products throughout the world. (*Id.*)

### b. The Prior Litigation and the Settlement Agreement

6. Plaintiffs Luv N' Care and Admar previously sued Defendant Royal King in this Court in April 2008 (the "Prior Litigation"). (Dkt. No. 220 at 13.)

7. The parties settled the Prior Litigation and entered into a Settlement Agreement on June 22, 2009 (the "Settlement Agreement" or "Agreement"). (*Id.*; PTX 29.)

8. The Settlement Agreement was duly executed by Plaintiffs and Defendant and is valid and enforceable. (Dkt. No. 220 at 13.)

9. Mr. Dalbir Khurana of Royal King and Mr. Eddie Hakim of Luv N' Care negotiated some of the terms of the Settlement Agreement. (*Id.*)

10. Both parties were represented by counsel during the course of the settlement negotiation. (*See, e.g.*, PTX 791.)

11. As part of the Settlement Agreement, the parties agreed that Royal King would pay Luv N' Care a 12% royalty on all past sales of the fifteen products listed in Exhibit A to the Settlement Agreement (the "Products"). (PTX 29 at 1, 10-14.) The parties agreed that the total royalty to be paid by Royal King under the Settlement Agreement amounted to $396,000 USD, "based on Royal King's representation as to the total US and international sales of the Products." (*Id.* at 1.)

12. As part of the Settlement Agreement, Royal King did pay Luv N' Care $396,000 (12% of

3

$3.3 million) plus $500,000 in attorney's fees. (Dkt. No. 220 at 14.)

13. Royal King further agreed to immediately cease and desist worldwide from making and selling the Products, and "any version of the Products or their packaging that are likely to cause confusion with Luv N' Care's products or packaging." (PTX 29 at 1.)

14. In exchange, Luv N' Care agreed to a global settlement of all past and present claims Luv N' Care had or has against Royal King with respect to the Products – not limited to the particular colors shown in Exhibit A thereto – through the date of the Agreement. (*Id.* at 1.)

15. The parties further agreed to release "all past and present claims, demands, obligations, liabilities and causes of action worldwide, of any nature whatsoever, at law or equity, asserted or unasserted, known or unknown arising out of or in connection with the Products." (*Id.* at 2.)

16. The Settlement Agreement contains an integration clause which states, in relevant part, that the agreement "constitutes the entire agreement and understanding between the parties," and that it "supersedes all previous understandings, agreements and representations between the parties, written or oral." (*Id.* at 3.) The Settlement Agreement also contains a choice of law provision which states that the terms and conditions of the Agreement shall be governed and interpreted under Texas law. (*Id.*)

17. On April 12, 2013, in response to Royal King's First Set of Interrogatories in this litigation, Luv N' Care stated that the parties' intent was that "the Products," as referenced in the Settlement Agreement, includes the products specifically identified in Exhibit A "as well as any versions or iterations of those products." (DTX 1059 at 12.)

   c. **The Replacement Products**

18. On May 21, 2009, during the course of the Prior Litigation, Scott A. Daniels, attorney for

Royal King, sent a letter to Morris Cohen, attorney for Luv N' Care, attaching pictures of certain Royal King products redesigned to replace five of its old products. (DTX 1005 at 2.) Four out of the five old products are listed in Exhibit A to the Settlement Agreement as part of "the Products." (*Id.*; PTX 29 at 10, 12-13.)

19. During the Prior Litigation, Royal King produced to Luv N' Care certain email exchanges between Royal King and its customers. (PTX 569 at 7-8; DTX 1001.) These documents included a photograph of two redesign options that Royal King offered to its customers for replacing certain of Royal King's old products. (DTX 1001 at 4.)

20. In the instant case, Luv N' Care has accused some of these replacement products as likely to cause confusion with Luv N' Care's products (the "Replacement Products"). (*See, e.g.*, 12/4/2013 Trial Tr. at 33:19-33:21 (Sachdev).)

### d. Negotiation Regarding The Replacement Products

21. In an email sent to Mr. Dalbir Khurana on June 9, 2009, Mr. Eddie Hakim recounted the parties' oral agreement to settle on "all merchandise which forms a part of the pending suit in Marshall, TX." at a royalty rate of 12%. (PTX 794 at 2.) Mr. Hakim also mentioned the possibility of "a full global settlement" at the same royalty rate for all Royal King products "which will be agreed upon as copies or look alike/knock offs." (*Id.*) As part of the oral agreement, Royal King promised to "discontinue all copied or look alike products upon signing or agreeing in principle to this agreement." (*Id.*)

22. Mr. Khurana emailed back to Mr. Hakim on the same day (June 9, 2009) and enclosed "a list of items in question." (PTX 794 at 4.) Mr. Khurana asked Mr. Hakim to "confirm this list covers up all items mentioned in your mail," and suggested that they "both agree on [this] list of items in question" so they could finalize the settlement agreement. (*Id.*) Mr. Khurana's

5

email included the pictures of fifteen Royal King "products in question." (*Id.* at 5-8.) Mr. Hakim acknowledged the receipt of these pictures sent by Mr. Khurana and further stated that Mr. Khurana "ha[d] all the items in question listed." (*Id.* at 13.) These fifteen products constitute the entirety of the Products eventually included in Exhibit A to the parties' Settlement Agreement. (PTX 29 at 10-14.)

23. The parties' counsel subsequently started negotiating the specific terms of the settlement agreement. On June 15, 2009, Luv N' Care's attorney Mr. Cohen emailed counsel for Royal King regarding the parties' disagreement on whether a general release should be included in the settlement agreement. (PTX 794 at 38-39.) Mr. Cohen stated that Luv N' Care only intended to include "a mutual release for all past and present claims for the Products set forth in that email, not for any other products," and that Luv N' Care "never intended to release [Royal King] from products that it did not expressly agree to...or that it may not even know about." (*Id.*) Mr. Cohen further stated that if Royal King wanted "a release for any other products, patent applications, or patents, Luv N' Care needs to see them so that they can be expressly discussed," and that the parties "then need to specifically list them if the parties can reach an agreement on them." (PTX 794 at 39; 12/4/2013 Trial Tr. at 67:6-70:8 (Sachdev))

24. In response to Mr. Cohen's email, Royal King's attorney Mr. Jonathan Pierce replied on June 16, 2009, demanding a general release not "specific to the products." (PTX 794 at 38.)

25. On the same day (June 16, 2009), Mr. Khurana also emailed Mr. Hakim about their counsel's disagreement regarding the general release. (*Id.* at 37.) Mr. Khurana requested that Mr. Hakim give Royal King a "general release" not limited to the list of products that the parties had previously agreed upon. (*Id.*)

26. In response, Mr. Hakim asked Mr. Khurana to let him know "what other item [he] want[ed]

6

to include" in the list of products to be released.  (PTX 794 at 36.)  Mr. Hakim further represented that "an overall general release for all products" was impossible because Luv N' Care could not release products that it did not know of.  (*Id.*)

27. Mr. Khurana replied stating that, aside from the products listed in his previous email, he had "no other product which has any similarity to [Luv N' Care] products," and that if he had any other product, he would have already included in the previous list.  (PTX 794 at 36.)

28. During the course of the settlement negotiation, Royal King never insisted on listing any of the Replacement Products in the settlement agreement.  (12/4/2013 Trial Tr. at 44:18-45:7 (Sachdev)).

   e. **Sales Figure of the Products**

29. By an email dated June 10, 2009, Mr. Khurana represented to Mr. Hakim that Royal King's sales of the Products amounted to $3.3 million, $2.3 million of which were U.S. sales.  (PTX 794 at 19-20.)  Mr. Hakim responded that, based on Mr. Khurana's representation of Royal King's sales figure, he calculated that the amount to be paid by Royal King was $396,000 based on a 12% royalty.  (*Id.* at 19.)  Royal King paid this amount under the finalized Settlement Agreement.  (PTX 29 at 1; Dkt. No. 220 at 14.)

30. On September 1, 2009, a little over two months after the parties executed the Settlement Agreement, Royal King's outside counsel Scott Daniels emailed Luv N' Care's in-house attorney Joe D. Guerriero confirming that the total sale of the Products amounted to about $3.0 million.  (PTX 798 at 1.)  Mr. Daniels attached a breakdown of international sales among different settlement products, as well as a Royal King memo showing the breakdown of Royal King's US sales among different customers, including a company named Atico.  (*Id.* at 2-4, 6.)

31. Walgreens Co. ("Walgreens") purchased at least some of its Royal King products from Atico, which purchased those products from Royal King. (Dkt. No. 220 at 14.)

32. On May 12, 2009, in connection with a deposition in a New York lawsuit filed by Luv N' Care against Walgreens, Walgreens produced to Luv N' Care eight pages of accounting documents (the "Walgreens spreadsheet") marked "Highly Confidential – Attorney's Eyes Only" and "Outside Counsel Only" (*See* DTX 1037 at 4-11.) The Walgreens spreadsheet listed weekly entries of Walgreens's sales of Royal King's "Slipper Cup" product from August 2006 to April 2009. (*Id.*)

## II. CONCLUSIONS OF LAW

### a. Jurisdiction

1. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, in that the amount in controversy exceeds the value of $75,000, exclusive of interest and costs, and the action is between a citizen of a State and a citizen or subject of a foreign state.

### b. Royal King's Fraudulent Inducement Claim

#### i. *Applicable Law*

2. Guided by § 148 of the Restatement of Conflicts of Law, the Court previously found that Plaintiffs' fraud in the inducement claim is governed by Louisiana law. *See* Dkt. No. 192 at 2-3. The same reasoning applies to Defendant's fraud in the inducement claim, which arises out of the same set of facts as Plaintiffs' claim. Therefore, Defendants' fraudulent inducement claim is likewise governed by Louisiana law.

3. A contract is formed by the consent of the parties. La. Civ. Code Ann. art. 1927. However, consent may be vitiated by error, fraud, or duress. La. Civ. Code Ann. art. 1948. "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an

unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code Ann. art. 1953.

4. Under Louisiana law, an action for fraud against a party to a contract requires: "(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) that the error induced by the fraudulent act relates to a circumstance that substantially influenced the victim's consent to the contract." *Petrohawk Properties, L.P. v. Chesapeake Louisiana, L.P.*, 689 F.3d 380, 388 (5th Cir. 2012) (citing *Shelton v. Standard/700 Assocs.*, 798 So.2d 60, 64 (La. 2001)).

5. "Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." La. Civ. Code Ann. art. 1957.

6. While "fraud…cannot be predicated on unfulfilled promises or statements as to future events, [it] may be predicated on promises made with the intention not to perform at the time the promise is made." *Sun Drilling Products Corp. v. Rayborn*, 798 So. 2d 1141, 1152 (La. App. 2001).

7. An integration clause in a contract would not necessarily preclude the use of parol evidence to show error or fraud. *Vallejo Enter., L.L.C. v. Boulder Image, Inc.*, 950 So. 2d 832, 836 (La. App. 2006); La. C.C. art. 1848.

> ii. *The Court Concludes that Royal King Has Not Proven by a Preponderance of the Evidence that Luv N' Care Fraudulently Induced Royal King to Enter Into the Settlement Agreement*

8. Based on the findings of fact and applicable legal standards discussed above, the Court finds that Royal King has not proven by a preponderance of the evidence that Luv N' Care fraudulently induced Royal King to enter into the Settlement Agreement.

9. The integration clause in the Settlement Agreement does not preclude Royal King from using

9

parol evidence to prove its fraud in the inducement claim. Findings of fact ¶ 16; *Vallejo*, 950 So. 2d at 836; La. C.C. art. 1848.

10. Royal King has not proven by a preponderance of the evidence that Luv N' Care made "a misrepresentation, suppression, or omission of true information" regarding whether or not Royal King could sell products not identified in Exhibit A to the Settlement Agreement. La. Civ. Code Ann. art. 1953; *Petrohawk*, 689 F.3d at 388. It is clear under the Settlement Agreement that the parties resolved all then-pending claims arising out of the fifteen products specifically identified in Exhibit A, i.e., "the Products." Findings of Fact ¶ 14. It is also clear that the parties agreed to a global release of all known or unknown claims arising out of the Products. *Id.* at ¶ 15. The Agreement, however, contains no term that purported to release other products then being sold by Royal King. While Paragraph 6 did mention that Royal King would immediately cease the sale of "any versions of the Products" that "are likely to cause confusion with Luv N' Care's products," these "versions of Products" were left out of the parties' global settlement and worldwide release. *Id.* at ¶¶ 13-15.

11. Representations made by Luv N' Care during the course of the settlement negotiation are consistent with these final written terms of the Settlement Agreement. Mr. Cohen, Luv N' Care's attorney, specifically told Mr. Pierce, Royal King's attorney, that Luv N' Care only intended to release those products set forth in Mr. Khurana's email, i.e., the fifteen products listed in Exhibit A to the Settlement Agreement. *Id.* at ¶¶ 22, 23. Mr. Cohen further stated that Luv N' Care never intended to release products that "it did not expressly agree to." *Id.* at ¶ 23. Despite Mr. Pierce's and Mr. Khurana's subsequent requests for a general release not specific to the Products, Mr. Hakim affirmed that an overall general release for all products was impossible because Luv N' Care could not release products that it did not know of. *Id.*

at ¶¶ 24-26. Indeed, Mr. Hakim asked Mr. Khurana to let him know other possible items Mr. Khurana wanted to include in the Products list. *Id.* at ¶ 26. While Mr. Khurana was well aware of the Replacement Products Royal King was then selling, he told Mr. Hakim that he had no other products to add to the list. *Id.* at ¶¶ 18, 27-28.

12. Therefore, the written terms of the Settlement Agreement expressly limits the scope of the release to the fifteen products specifically identified in Exhibit A. This is further confirmed by the parties' email exchanges during the course of the settlement negotiation. While certain response to interrogatory, made by Luv N' Care almost four years after the Settlement Agreement, *see id.* at ¶ 17., vaguely suggests that "the Products" might have encompassed more than those identified in Exhibit A, the overall weight of the evidence supports a finding that, at the time of the Agreement, the parties agreed to release only those products expressly identified in Exhibit A. At no point of the negotiation did Luv N' Care tell Royal King that it intended to release all products then being sold by Royal King. The Court accordingly finds that Luv N' Care did not make a misrepresentation regarding Royal King's ability to sell the Replacement Products.

13. Royal King has not proven by a preponderance of the evidence that Luv N' Care made "a misrepresentation, suppression, or omission of true information" with respect to the sales figure of the Products. La. Civ. Code Ann. art. 1953; *Petrohawk*, 689 F.3d at 388. Specifically, Royal King has not proven that Luv N' Care knew about the inconsistency of sales figures as demonstrated by the Walgreens spreadsheet while suppressed this information to "obtain an unjust advantage or cause damage or inconvenience" to Royal King. *See Petrohawk*, 689 F.3d at 388. The Walgreens spreadsheet is one of many documents produced to Luv N' Care in the course of another litigation. Findings of Fact ¶

32. The document itself did not show a total sales figure of Royal King's products. *Id.* Instead, it contained weekly entries of Walgreens's sales of just one Royal King product, the "Slipper Cup." *Id.* While the Walgreens spreadsheet was in Luv N' Care's possession prior to the Settlement Agreement, and a simple calculation based on the spreadsheet would have revealed the inconsistency between the Walgreens sales and the sales figure Mr. Khurana represented to Mr. Hakim, the spreadsheet, by itself, is not direct proof that Luv N' Care did in fact conduct such calculation and know about the inconsistency before entering into the Agreement. *See id.* at ¶¶ 29, 32.

14. Indeed, after Mr. Khurana gave Mr. Hakim an estimation of Royal King's total sales during negotiation, the parties continued their dispute about the proper sales figure even after the Settlement Agreement had been signed. *Id.* at ¶ 30. Two months after the execution of the Settlement Agreement, Royal King's attorney Mr. Daniels sent Luv N' Care a number of documents purporting to resolve the final sales figure. *Id.* These documents included a breakdown of Royal King's US sales among its different customers, in particular, the sales made to Atico – Walgreens's supplier. *Id.* at ¶¶ 30-31. It is possible that Luv N' Care did not start cross-checking Royal King's Atico/Walgreens sales against the Walgreens spreadsheet until after they received such final representation about Atico's specific sales figure. While Luv N' Care, in this litigation, did accuse Royal King of underreporting its total sales primarily on the basis of the Walgreens spreadsheet, it did not bring such claim until sixteen months after the Settlement Agreement, subjecting its fraudulent inducement claim to be barred by the one-year prescriptive period. (*See* Dkt. No. 192.) Had Luv N' Care known about the inconsistency arising from the Walgreens spreadsheet prior to the Settlement Agreement, and secretly planned on bringing another lawsuit against Royal King

on the basis of such, it could have easily filed its claim before the one-year prescriptive period ran out. Therefore, the Court is not convinced that Luv N' Care knew about the inconsistent sales figures prior to the Settlement Agreement and suppressed that information to gain an "unjust advantage." *See Petrohawk*, 689 F.3d at 388.

15. In sum, the Court finds that Royal King has not proven by a preponderance of the evidence that Luv N' Care made "a misrepresentation, suppression, or omission of true information" with respect to either the Replacement Products or the sales figure of the Products. *Id.*

   c. **Royal King's Equitable Estoppel Defense**

      i. *Applicable Law*

16. Royal King raises equitable estoppel as an affirmative defense against Luv N' Care's breach of contract claim. The Settlement Agreement contains a choice of law provision which states that the terms and conditions of the Agreement shall be governed and interpreted under Texas law. Findings of Fact ¶ 16. Accordingly, the Court applies Texas law in determining Royal King's equitable estoppel defense.

17. "Equitable estoppel precludes one from asserting a right they would otherwise have because of their act, conduct or silence." *Cole v. Anadarko Petroleum Corp.*, 331 S.W.3d 30, 40 (Tex. App. 2010) (citing *Forest Springs Hosp. v. Ill. New Car & Truck Dealers Ass'n Employees Ins. Trust*, 812 F. Supp. 729, 733 (S.D. Tex. 1993)).

18. Equitable estoppel applies "when it would be unconscionable to allow a person or party to maintain a position inconsistent with one in which it acquiesced or from which it accepted a benefit." *Id.* Put otherwise, it "forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Hartford Fire Ins. Co. v. City of Mont Belvieu, Tex.*, 611 F.3d 289,

298 (5th Cir. 2010) (citing *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App. 1994).

19. "Equitable estoppel differs from traditional estoppel in that it does not require a showing of a false representation or detrimental reliance." *Cole*, 331 S.W.3d at 40. It does, however, "assumes detriment and requires the inconsistency to be a cause of that detriment." *Hartford Fire*, 611 F.3d at 298.

> *ii. The Court Concludes that Royal King Has Not Proven by a Preponderance of the Evidence that Equitable Estoppel Bars Luv N' Care's Claim For Breach of Contract*

20. Based on the findings of fact and applicable legal standards discussed above, the Court finds that the doctrine of equitable estoppel does not bar Luv N' Care's claim for breach of contract.

21. Royal King has not proven by a preponderance of the evidence that Luv N' Care took an inconsistent position to avoid corresponding obligation after accepting the benefits of the Settlement Agreement. *See Hartford Fire*, 611 F.3d at 298. As discussed above, the release under the Settlement Agreement was limited in scope to the fifteen products specifically identified in Exhibit A. Conclusions of Law ¶ 10. The Agreement did not release other products then being sold by Royal King. *Id.* During the course of the negotiation, Luv N' Care also repeatedly represented that it only intended to release those products listed in Exhibit A, and not products "it did not expressly agree to." Findings of fact ¶¶ 23, 26. Therefore, in reaching the Settlement Agreement with Royal King, Luv N' Care did not release Royal King from the Replacement Products. Its filing of the instant lawsuit based on the Replacement Products does not constitute "maintain[ing] a position inconsistent with one in which it acquiesced or from which it accepted a benefit." *See Cole*, 331 S.W.3d at 40.

## III. CONCLUSION

For the reasons set forth above, the Court finds that Royal King has not demonstrated by a preponderance of the evidence that Luv N' Care fraudulently induced Royal King to enter into the Settlement Agreement, or that Luv N' Care's breach of contract claim should be barred by the doctrine of equitable estoppel. Accordingly, judgment shall be entered in favor of Luv N' Care and against Royal King on Royal King's claim for fraudulent inducement and defense of equitable estoppel.

**So ORDERED and SIGNED this 14th day of February, 2014.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE