IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| LUV N' CARE, LTD. and ADMAR INTERNATIONAL, INC., | § § § | |
| Plaintiffs, Counter-Defendants, | § § | Civil Action No. 2:10-cv-461-JRG |
| v. | § § | |
| ROYAL KING INFANT PRODUCTS CO. LTD., | § § § | |
| Defendant, Counter-Plaintiff. | § § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are the post-trial motions pending in this case relating to damages and remedies. Defendant Royal King Infant Products Co., Ltd. ("RK") filed a (1) Motion in the Alternative for a New Trial on Damages on Plaintiff's Count I for Breach of Contract (Or, At Least, Reducing the Damage Award) and (2) a Motion for a New Trial on Damages. (Dkt. No. 240.) Plaintiffs Luv n' Care Ltd. and Admar International, Inc. (collectively, "LNC" or "Plaintiffs") oppose RK's Motions. (Dkt. No. 251.) Also before the Court is LNC's Motion for Post-Verdict Damages (Dkt. No. 243), which RK opposes (Dkt. No. 252). The Court also takes up LNC's Motion for a Permanent Injunction (Dkt. No. 237), which RK opposes (Dkt. No. 238).

The Court previously denied RK's motion to amend (Dkt. No. 240) the Court's February 14, 2014 Memorandum Opinion and Order (Dkt. No. 234) regarding RK's equitable estoppel defense and fraudulent inducement claim. (Dkt. No. 282.) The Court has also, by prior order, separately addressed the parties' post-trial motions relating to liability (Dkt. No. 283). The Court turns now to the area of damages and remedies issues. For the reasons set forth below, the parties' motions relating to damages and remedies are **DENIED**.

## I. BACKGROUND

### A. Settlement Agreement

On June 22, 2009, the parties executed a settlement agreement (Dkt. No. 1-1, "Settlement Agreement") to resolve a 2008 trademark case previously before this Court. (Dkt. No. 192.) Under the terms of the Settlement Agreement, RK would pay royalties on sales of certain products that RK made before the Settlement Agreement and would stop making the same:

> 1) Royal King shall pay a 12% royalty on all past sales of the products listed on the spreadsheet attached hereto as Exhibit A (hereinafter "the Products"). The total royalty for all U.S. and international sales is $396,000 USD, based on Royal King's representations as to the total US and international sales of the Products.
> . . .
> 6) Royal King will immediately cease and desist worldwide from making, selling, offering to sell, marketing, and/or promoting the Products, including any versions of the Products or their packaging that are likely to cause confusion with LNC's products or packaging. In the event that Royal King has any remaining Products in inventory, Royal King shall have 30 days from execution of this Settlement to sell-off any such remaining Products, shall report any sales beyond those paid for in this Agreement, and shall pay the 12% royalty on such sales. Any products, and the Molds for such products, remaining more than 30 days from execution of this Settlement shall be destroyed, and Royal King shall provide proof of same.

(Dkt. No. 1-1 ("Settlement Agreement").) The terms of the Settlement Agreement also provided for a release of past and present claims relating to the products at issue:

> 5) LNC and Royal King agree that this is a global settlement of all past and present claims LNC had or has against Royal King with respect to the Products up through the date of the present Agreement, and that this settlement and the Products in this Agreement are not limited to the colors in the images below, or any particular colors. . . . .
> . . .
> 8) Subject to the provisions in this Agreement, LNC and Royal King hereby release, acquit and discharge one another . . . from and against any and all past and present claims, demands, obligations, liabilities, and causes of action worldwide, of any nature whatsoever, at law or in equity, asserted or unasserted, known or unknown arising out of or in connection with the Products. . . .

(Settlement Agreement ¶¶ 5, 8.)

On November 4, 2010, LNC brought this suit against RK alleging breach of contract, fraud in the inducement, tortious interference with existing and prospective contractual or business relations, and patent infringement. (Dkt. No. 20.) In response, RK raised a number of affirmative defenses including equitable estoppel and the statutes of limitation. (Dkt. No. 116.) RK brought counterclaims accusing LNC of breach of contract, tortious interference with existing and prospective contractual or business relations, and fraud in the inducement. (*Id.*)

**B.     Jury Trial**

The Court began a jury trial in the present case on October 7, 2013. Three days later, the Jury returned a unanimous verdict. In its verdict, the Jury found that RK had violated Paragraph 1 of the Settlement Agreement by under-reporting sales and underpaying royalties on the Settlement Products for the period before the Settlement Agreement; that RK had violated Paragraph 6 of the Settlement Agreement by selling versions of the Settlement Products that were likely to cause confusion with LNC's products for the period after the Settlement Agreement; and that $10,000,000.00 was the "sum of money, if paid now" which would "adequately compensate Plaintiffs Luv N' Care and Admar as to . . . [LNC's claim of] breach of contract." (Dkt. No. 195 ("Verdict") ¶¶ 1–2, 4(A).)

The Jury further found that RK did not engage in intentional interference with LNC and/or Admar's existing or prospective contractual or business relations regarding any of LNC and/or Admar's customers; and that $0.00 was the "sum of money, if paid now" which would "adequately compensate Plaintiffs Luv N' Care and Admar as to . . . [LNC's claim of] intentional interference." (Verdict ¶¶ 3, 4(B).) The Court has reaffirmed the Jury's findings on this count. (Dkt. No. 283.)

The Jury further found that LNC and/or Admar did engage in intentional interference with RK's existing or prospective contractual or business relations regarding any of RK's customers but that $0.00 was the "sum of money, if paid now" which would "adequately compensate Defendant Royal King as to . . . [RK's claim of] intentional interference." (Verdict ¶¶ 8, 9(B).) The Court previously granted a motion filed by LNC for judgment as a matter of law under Rule 50(b) on liability on these claims, finding that there was no support for the Jury's finding of Plaintiff's liability. (Dkt. No. 283.)

### C. Bench Trial

On December 4, 2013, the Court held a bench trial to hear additional evidence presented solely on RK's fraud in the inducement claim. (*See* Dkt. No. 213.) The Court also heard arguments relating to RK's equitable estoppel defense. (*See* Dkt. No. 213 at 3–4; Dkt. No. 198 at 1.) On February 14, 2014, this Court entered its Findings of Fact and Conclusions of Law relating to RK's fraud in the inducement claim and equitable estoppel defense. (Dkt. No. 234.) This Court found that RK had not demonstrated by a preponderance of the evidence that LNC had fraudulently induced RK to enter into the Settlement Agreement, or that LNC's breach of contract claim should be barred by the doctrine of equitable estoppel. (*Id.*) Accordingly, judgment was entered in favor of LNC and against RK on RK's claim for fraudulent inducement and defense of equitable estoppel. (*Id.*)

RK moved the Court to amend, under Rule 52(b), the Court's findings in the February 14, 2014 Memorandum Opinion and Order (Dkt. No. 234 ("Memorandum Opinion")) denying RK's claim for fraud in the inducement and RK's defense of equitable estoppel. (Dkt. No. 240.) RK asserted that the Court should find additional facts that would support a finding that RK had proven by a preponderance of the evidence its claim for fraud in the inducement and its defense

of equitable estoppel. (*See* Dkt. No. 240.) The Court denied RK's motion. (Dkt. No. 282.)

## II. DAMAGES FOR LNC'S CONTRACT CLAIM AGAINST RK

On LNC's breach of contract claim against RK, the Jury found that RK was liable and awarded a $10 million lump sum to LNC. (Verdict ¶¶ 1, 2, 4(A)). RK seeks a new trial or, in the alternative, reduction of the Jury's award, while LNC seeks additional post-verdict damages.

### A. RK's Motion for New Trial on Damages or Reduction of Award

RK moves the Court to grant a new trial on the amount of LNC's damages, or, at least, to reduce the Jury's $10 million lump sum damages award. (Dkt. No. 240 at 27–28.)

#### 1. Applicable Law

Under FRCP 59(a), a new trial can be granted to any party after a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FRCP 59(a). In considering a motion for a new trial, the Court applies the law of the Fifth Circuit, where "[a] new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). "The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999).

Remittitur, a reduction of a damages award, is appropriate where the award "is greater than the maximum amount the trier of fact could have properly awarded," *Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 394 (5th Cir. 2013), or is "clearly excessive," *Thompson v. Connick*, 553 F.3d 836, 865 (5th Cir. 2008). However, the Fifth Circuit "will not reverse a jury verdict for excessiveness except on the strongest of showings." *Knight v. Texaco,*

*Inc.*, 786 F.2d 1296, 1299 (5th Cir. 1986). In *Caldarera*, the Fifth Circuit explained that the jury's award should stand unless it is entirely disproportionate to the injury sustained, such as awards so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to." *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983) (internal citations omitted); *see also Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 462 (5th Cir. 1995) (per curiam). In the Fifth Circuit, if the jury's award is remitted and the Plaintiff declines the remitted award, the Plaintiff may choose to have a new trial on damages alone. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995).

## 2. Background

RK argues that the record lacks substantial evidence supporting the Jury's $10 million lump sum damages award. (*Id.* at 27.) Mr. Eddie Hakim, Plaintiffs' CEO, testified that damages reached at least $8.4 million, but RK argues that the Court should disregard this testimony as both hearsay and as being based on speculation and guesswork. (*Id.* at 27 n.10.) Instead, RK asserts, Plaintiff's only reliable evidence supports at most $1.8 million in damages, as presented in testimony from Plaintiff's damages expert, Mr. Payne. (*Id.* at 27.) Therefore, RK argues, $1.8 million should be the absolute maximum for Plaintiff's damages, and the $10 million jury award should be reduced because it far exceeds that maximum. (*Id.*)

In response, LNC argues that the Jury had the right to accept any of the testimony presented by LNC, whether by Mr. Hakim or Mr. Payne. (Dkt. No. 251 at 23.) LNC argues that the two witnesses' testimony regarding the proper amount of damages may have differed because of their different perspectives: Mr. Hakim's testimony was presented from his

perspective as LNC's CEO and as a businessman with a lifetime of experience in the industry. (*Id.*) In contrast, Mr. Payne's expert testimony was based on his analysis of the documents produced by RK and third-party customers. (*Id.*) LNC further argues that the Jury was presented with evidence that RK's imperfect record-keeping practices made it virtually impossible for Mr. Payne, LNC's forensic accounting expert, to prove damages precisely, and therefore RK cannot complain about Mr. Hakim's method of calculating damages. (*Id.* at 24.) In light of the Court's jury instructions and RK's deficient record-keeping, LNC argues, the Jury was entitled to award LNC $10 million in damages based on Mr. Hakim's testimony in support of at least $8.4 million in damages.

### 3. Mr. Hakim's testimony

On the first day of trial, Mr. Hakim, the CEO of Plaintiffs Luv N' Care and Admar International, testified for Plaintiffs. Mr. Hakim had been in the baby bottle industry since the mid-1980s and testified at length about his experience in the baby products markets and his knowledge of his competitors' business. (10/7/2013 P.M. Tr. (Hakim), Dkt. No. 200, at 66:3–12.) Mr. Hakim discussed the history of the case, including the previous litigation that resulted in the Settlement Agreement at the heart of this case. As part of the settlement, RK had agreed to pay 12% royalties on pre-settlement sales of specific RK products. (Settlement Agreement at ¶ 1.) The accused sales in this case involved both under-reported pre-settlement sales of certain products and post-settlement sales of confusingly similar products, which LNC claimed should all be subject to the 12% royalty from the Settlement Agreement.

To establish the base sales amount that the royalty would apply to, Mr. Hakim testified "[b]ased on his experience and knowledge of the industry" that RK had relevant pre-settlement sales of $21 million and relevant post-settlement sales of $50 million. (10/7/2013 P.M. Tr.

(Hakim), Dkt. No. 200, at 150:18–151:25.) Combining the pre-and post-settlement sales, he estimated that the base sales number was $70 million (made up of $20 million in pre-settlement sales and $50 million in post-settlement sales), of which 12% is $8.4 million. (Dkt. No. 251 at 23–24.)

### i. Pre-settlement under-reported sales

RK objects that Mr. Hakim's testimony that $20 million in pre-settlement sales were under-reported was based on unreliable evidence—conversations with others, seeing products on the shelf after the signing date of the Settlement Agreement, and the Walgreens Spreadsheet (DX 1037).

RK argues that both Mr. Hakim and Mr. Payne (LNC's damages expert) relied on the same document—the Walgreens Spreadsheet—to estimate pre-settlement sales, but each testified as to very different totals ($21 million and $4 million, respectively), and therefore Mr. Hakim's testimony is not credible. (Dkt. No. 254 at 9.) On cross examination, Mr. Hakim stated that he relied on documents produced in the LNC-Walgreens lawsuit in New York, which he was prohibited from viewing under New York lawsuit's protective order, but had been shown earlier in this trial. RK's counsel attempted to determine what Walgreens documents Mr. Hakim had relied on to reach his $21 million calculation, displaying the Walgreens Spreadsheet (DX 1037) and asking Mr. Hakim whether or not he had relied on it. (10/8/2013 A.M. Tr. (Hakim), Dkt. No. 201, at 58:20–59:22.) Mr. Hakim testified that he did not recognize the Walgreens Spreadsheet, and stated that the document he relied on had a totals page, which the Walgreens Spreadsheet did not have. (*Id.*) RK is incorrect—Mr. Hakim never testified that he had relied specifically on the Walgreens Spreadsheet (DX 1037), only that he relied on documents produced in the LNC-Walgreens lawsuit, which he saw briefly during trial, and that the Walgreens Spreadsheet did not

have a "totals page" that was in the document he relied on. (*Id.* at 56:8–57:2.)

A reasonable jury could have determined, based on Mr. Hakim's testimony that he did not recognize the Walgreens Spreadsheet, that he relied on a different Walgreens document to calculate his damages, explaining the discrepancies between Mr. Hakim and Mr. Payne's calculations.

Notably, Mr. Hakim did not rely only on a Walgreens document to establish his pre-settlement under-reported sales figure. Mr. Hakim testified at length that he believed RK underreported its pre-agreement sales because the records for sales and conversations with customers did not match up to LNC's figures, providing as a specific example his observation of discrepancies regarding sales to customers in Mexico and to Dollar General. (10/7/2013 P.M. Tr. (Hakim), Dkt. No. 200, at 128:18–131:24.)

The Jury was entitled to take into account, as the foundation for Mr. Hakim's opinion regarding the damages amount, his testimony regarding his reliance on conversations and documents in addition to his observations of products on shelves after the Settlement Agreement was signed. (10/8/2013 A.M. Tr. (Hakim), Dkt. No. 201, at 58:20–59:22.)

### ii. Post-settlement sales of confusingly similar products

Mr. Hakim also testified as to the damages for RK's post-settlement alleged sales of confusingly similar products. Based on his experience and knowledge of the industry, Mr. Hakim testified that the amount of relevant RK sales for the post-settlement time period was approximately $50 million. (10/7/2013 P.M. Tr. (Hakim), Dkt. No. 200, at 150:18–24.) Using the logic that sales of confusingly similar products violated the Settlement Agreement, and that those sales should be subject to the same 12% royalty rate from the Settlement Agreement, Mr. Hakim estimated that the post-settlement damages from those sales was $6 million. (*Id.* at 151:2–152:3.)

RK objects that Mr. Hakim's testimony of $50 million in post-settlement sales was a number for which he did not even attempt to provide a basis, arguing that his testimony was so unreliable that LNC's own expert, Mr. Payne, did not rely on it. (Dkt. No. 240 at 27 n.10; Dkt. No. 254 at 8 (citing 10/9/2013 P.M. Tr. (Payne), Dkt. No. 204, at 85:19–86:15).) Notably, however, Mr. Payne only remarked that he did not rely on Mr. Hakim's *pre*-settlement sales calculation and did not discuss whether he had considered Mr. Hakim's testimony regarding *post*-settlement sales of $50 million. (10/9/2013 P.M. Tr. (Payne), Dkt. No. 204, at 85:19–86:15.) Accordingly, Mr. Payne's testimony that he did not rely on Mr. Hakim's pre-settlement sales estimate is inapposite and does not reflect upon the reliability of Mr. Hakim's testimony.

The Jury, in its role as fact finder, was entitled to take into account, as the foundation for Mr. Hakim's opinion regarding the post-settlement damages amount, his testimony regarding his reliance on his experience and knowledge of the industry. (10/8/2013 A.M. Tr. (Hakim), Dkt. No. 201, at 58:20–59:22.)

### 4. Mr. Payne's testimony

Mr. Payne, Plaintiff's damages expert, was a forensic accountant tasked with calculating damages for this case and was tendered without objection as an expert in the areas of forensic accounting, fiduciary services, and economic damages assessment. (10/9/2013 P.M. Tr. (Payne), Dkt. No. 204, at 4:6–6:17.)

RK generated and produced sales reports in this case, which Mr. Payne found unreliable. (*Id.* at 9:24–10:3.) Indeed, Mr. Payne explained to the Jury in great detail the discrepancies he found in the twelve sales reports that RK produced, detailing why the sales reports did not accurately summarize all the underlying sales transactions for the accused products. (*Id.* at 12:1–22:9.)

Specifically, Mr. Payne pointed out to the Jury a discrepancy where RK listed exactly $3,059,000 worth of sales in two reports, but reflected different quantities sold in the two reports—over 3 million units in one report but almost 4.7 million units in another report. (*Id.* at 16:1–17:22.) Suspicious of RK's sales reports, Mr. Payne determined that third-party sales invoices generated in the ordinary course of business—also known as pro forma sales invoices— were more reliable than RK's sales reports. (*Id.* at 17:23–19:14.) Using the pro forma sales invoices, he recreated the sales for the same time frame, finding $5,127,956 in sales and 7,221,635 units sold, much higher in both sales units and dollars than reported by RK. (*Id.*) In light of this analysis and other analysis he presented to the Jury, Mr. Payne concluded that there was a general pattern of underreporting in RK's sales reports. (*Id.* at 28:13–25.) Therefore, Mr. Payne determined that he should use the pro forma sales invoices, instead of RK's sales reports, as the basis for his opinions on relevant sales and damages in his expert report and in his testimony. (*Id.* at 9:24–10:22.)

Mr. Payne's expert report set out both pre-settlement and post-settlement sales. However, with regard to damages, Mr. Payne opined as to actual dollar amounts for only post-settlement damages, not pre-settlement damages. (10/9/2013 P.M. Tr. (Payne), Dkt. No. 204, at 44:17–21.) Accordingly, Mr. Payne testified as to the amount of pre-settlement sales, post-settlement sales, and damages on post-settlement sales, but did not testify as to damages on pre-settlement sales.

As to the period before settlement, Mr. Payne testified that there were $35 million in pre-settlement sales. (10/9/2013 P.M. Tr. (Payne), Dkt. No. 204, at 43:2–9.) However, due to Mr. Payne's assessment that the documentation RK produced in support of those pre-settlement sales was unreliable, he did not take the next step of calculating pre-settlement damages based on the $35 million pre-settlement sales base. Nevertheless, the Jury, provided with the sales base and

the Settlement Agreement royalty rate, could have drawn its own conclusions based on Mr. Payne's testimony.

As to the period after settlement, Mr. Payne found that post-settlement sales were $20,185,000. (*Id.* at 33:16–34:5.) After subtracting $1,285,000 in sales that were involved in prior Atico/Walgreens litigation to avoid double recovery, the base for post-settlement sales was $18,900,000. (*Id.* at 34:5–17.) Applying the 12% royalty rate, Mr. Payne arrived at $2,422,000 in royalties. (*Id.* at 34:17–35:9.) Further applying RK's previous $396,000 payment to LNC at the time of the settlement agreement, Mr. Payne found $1,872,000 in post-settlement royalty damages. (*Id.* at 35:9–16.) During the trial, in light of testimony from LNC's witness that one of the accused products should not be included, Mr. Payne removed that accused product from his analysis and ultimately concluded that LNC was entitled to $1,809,000 in monetary damages for post-settlement sales. (*Id.* at 35:16–36:4.)

### 5. The Court's Instructions to the Jury

After the close of evidence, the Court instructed the Jury on calculating damages. The parties submitted the compensatory damages instructions jointly and neither objected during the formal charge conference. (Dkt. No. 194 at 22; 10/10/2013 A.M. Tr. (Charge Conference), Dkt. No. 205, at 76:6–82:4.)

> Without objection, the Court charged the Jury in computing damages as follows:
>
> Computing damages may be difficult, but you must not let -- let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require that a party prove the amount of its losses and damages with mathematical precision but only with as much definiteness and accuracy as the circumstances permit.
>
> Difficulty in ascertaining the amount of damages is not to be confused with the right of recovery. When wrongdoers, by their actions, make it virtually impossible to prove damages precisely, they should not be able to complain of the method of proof as long as it is reasonable.

> You must use sound discretion in fixing an award of damages, drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

(10/10/2013 A.M. Tr. (Jury Charge), Dkt. No. 205, at 103:1–17) (paraphrasing *N. Texas Producers Ass'n v. Young*, 308 F.2d 235, 245 (5th Cir. 1962)).

In awarding LNC $10 million in damages, the Jury properly relied upon Mr. Payne's testimony that the sales reports produced by RK were unreliable and Mr. Hakim's testimony regarding the sum of damages as an experienced CEO of a company in the baby products industry. Indeed, in view of evidence that RK's recordkeeping practices were deficient, evidence that RK's sales reports were unreliable, and the fact that one of the claims in this suit was that RK had been underreporting sales, the Jury was entitled to consider the proof of damages as presented through testimony from Mr. Hakim and Mr. Payne. RK never offered any testimony to rebut the testimony of LNC's witnesses. The Jury's reliance on the proof presented during trial was reasonable.

### 6. The Jury's award is not clearly excessive

RK moves the Court to grant a new trial if it finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course. (Dkt. No. 240 at 5) (citing *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985)). However, a new trial may only be granted if the jury's award is "against the clear weight of the evidence" or will result in a "miscarriage of justice." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 n.3.; (Dkt. No. 251 at 22).

Alternatively, RK moves for remittitur—reduction of the damages award—which is within the sound discretion of this Court but is only appropriate if the award "is greater than the maximum amount the trier of fact could have properly awarded," *Delahoussaye v. Performance Energy Servs., L.L.C.*, 734 F.3d 389, 394 (5th Cir. 2013), or is "clearly excessive," *Thompson v.*

*Connick*, 553 F.3d 836, 865 (5th Cir. 2008).

Here, as discussed above, the Jury's award of $10 million is within the realm of appropriate damages drawing upon the testimony of Mr. Hakim and Mr. Payne and making reasonable inferences based thereon. While the Jury's award did go beyond LNC's estimate, the evidence upon which the Jury relied—including testimony regarding the unreliability of RK's sales data—supports the verdict. The verdict is not against the clear weight of the evidence, nor does it result in a miscarriage of justice. The evidence of destruction of evidence and inadequate recordkeeping, in combination with reasonable inferences the Jury may have drawn regarding the actual sales numbers, the circumstances of this case, and the actions of RK, support the Jury's verdict. The verdict is not clearly excessive. Accordingly, RK's motions for a new trial and for remittitur (Dkt. No. 240) are **DENIED**.

### B.     LNC's Motion for Post-Verdict Damages

On LNC's breach of contract claim against RK, LNC moves for an award of post-verdict damages in addition to the Jury's $10 million award. (Dkt. No. 243; Verdict ¶ 4(A).)

LNC argues that it is entitled to damages on post-verdict sales of the accused products, because the Jury's damages award only accounted for damages up to the time of trial. (Dkt. No. 243 at 2.) RK responds that there is no basis—either in case law or by statute—by which LNC may recover post-verdict damages in a breach of contract suit under Texas law. (Dkt. No. 252 at 2–3.)

The cases LNC cites in support of its request are inapposite. *See* (Dkt. No. 243 at 3–5.) Of the ten cases LNC cites, seven involve claims for post-verdict damages in cases where the

court had express statutory power to award post-verdict damages.[1] Two cases hold only that ongoing conduct gives rise to claims, without saying whether or not post-verdict damages are actually recoverable.[2] Finally, LNC cites a single case in which a court has granted post-verdict damages on a claim for breach of contract—a Louisiana state trial court's order in a lawsuit filed by Plaintiffs under Louisiana state law. (Dkt. No. 258 at 3); *Luv N' Care, Ltd. v. Jackal Int'l Ltd.*, Case No. 10-1891 (La. 4th District Ct.—Ouachita Parish June 27, 2013). This unpublished order is not entitled to any precedential weight because it does not apply Texas state law, and therefore does not establish the availability of post-verdict damages in this case.

The Court finds that LNC has failed to meet its burden of proving that it is entitled to post-verdict damages on its breach of contract claim in this case and therefore LNC's motion for post-verdict damages (Dkt. No. 243) is **DENIED**.

### III. DAMAGES FOR RK'S INTENTIONAL INTERFERENCE CLAIM AGAINST LNC

On RK's tortious intentional interference claim against LNC, the Jury found that LNC was liable, but did not award any damages to RK. (Verdict at ¶¶ 8, 9(B).) However, the Court found that, as a matter of law, RK was not liable for intentional interference. (Dkt. No. 283.)

RK moves for a new trial on the damages amount for RK's claims for tortious interference. (Dkt. No. 240 at 29–30). However, in light of the Court's finding that RK was not liable for intentional interference, RK's motion (Dkt. No. 240) for a new trial on damages on that

---

[1] *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009) (patent claim); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 526 (10th Cir. 1987) (allowing discovery of post-verdict sales in a Lanham Act case); *Clearline Techs., Ltd.*, 948 F. Supp. 2d at 710–11 (Lanham Act claim); *Mondis Tech., Ltd. v. Chimei Innolux Corp.*, 822 F. Supp. 2d 639, 642 (E.D. Tex. 2011) (patent claim); *i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 597 (E.D. Tex. 2009) (patent claim), *aff'd*, 598 F.3d 831 (Fed. Cir. 2010); *Nat'l Instruments Corp. v. Mathworks, Inc.*, No. 01-CV-11, 2003 WL 24049230, *4 (E.D. Tex. June 23, 2003) (patent claim), *aff'd*, 164 Fed. App'x 997 (Fed. Cir. 2006); City of San Antonio v. Hotels.com, L.P., No. SA-06-CA-381, 2012 WL 9033363, *2 (W.D. Tex. Aug. 27, 2012).

[2] *See James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir. 1978); *Arquette v. Hancock*, 656 S.W.2d 627, 629 (Tex. App. – San Antonio 1983).

claim is **DENIED AS MOOT**.

IV.     **PERMANENT INJUNCTION**

Aside from the damages award and in light of the Jury's finding of RK's liability on LNC's breach of contract claim and the Court's judgment on the remaining equitable claims and defenses in favor of LNC, LNC moves for a permanent injunction enjoining RK from further violation of the Settlement Agreement, including manufacture or sale by RK of the products established to be unlawful or other versions of those products. (Dkt. No. 237).[3]

A.     **Applicable Law**

Under Texas law, a permanent injunction is only proper when there is evidence of four elements: (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law." *Wiese v. Healthlake Cmty. Ass'n*, 384 S.W.3d 395, 399 (Tex. App. – Houston [14th Dist.] 2012).[4] Courts do not enforce contractual rights by permanent injunction unless the complaining party can show an inadequate remedy at law and irreparable injury. *Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 487 (Tex. App. – Houston [1st Dist.] 2006, pet. denied).[5]

---

[3] Specifically, LNC requests in its proposed injunction (Dkt. No. 237-13) that RK be "immediately and permanently enjoined throughout the world from selling, offering for sale, advertising, marketing, and/or promoting any of the products set forth in the parties' June 22, 2009 Settlement Agreement ("Settlement Agreement"), and any of the products found by the Jury to be in violation of that Settlement Agreement, including any versions of the aforesaid products or their packaging that are likely to cause confusion with or are colorable imitations of LNC's products or packaging."

[4] Plaintiffs' citations to cases addressing the availability of injunctive relief under legal theories that are not in this case, such as claims arising under the Lanham Act and deceptive trade practices under Tex. Bus. & Com. Code § 17.46, are inapposite. (*See* Dkt. No. 237 at 4, 5 nn. 10, 11.)

[5] The Court notes that *Cytogenix* sets forth an additional framework for analyzing whether specific performance via injunctive relief is available as a contractual remedy: whether (1) an adequate remedy at law exists; (2) present performance is possible; (3) the agreement contains precise terms capable of enforcement; and (4) the injunction comports with the terms of the agreement. *Cytogenix*, 213 S.W.3d at 487. "A court should not decree future contractual performance by requiring a party to perform a continuous series of acts, extending through a long period of time, over which the court exercises its supervision." *Id.* Unless a "significant public interest" is involved, parties to a contract are "left to their remedies at law." *Id.* The parties do not utilize this framework in their analysis, and the Court finds that the same result would hold under the *Cytogenix* analysis and therefore sets forth herein the standard four-factor permanent injunction analysis.

B. Analysis

1. A Wrongful Act

In this case, RK pledged in the Settlement Agreement that it would cease and desist worldwide from making or selling the Settlement Products, "including any versions of the [Settlement] Products or their packaging that are likely to cause confusion with LNC's products or packaging." (Settlement Agreement ¶ 6.) The Jury found that RK violated that clause of the Settlement Agreement by selling versions of the Settlement Products that were "likely to cause confusion" with LNC's products after the Settlement Agreement was signed. (Verdict ¶ 2.) LNC argues that a wrongful act is clearly present because the Jury determined that RK unlawfully sold products in breach of the Settlement Agreement, and any continued sales of those products would be wrongful acts in continued violation of the Settlement Agreement. (Dkt. No. 237 at 5.)

In addition to violating the agreement, LNC also argues that the Jury found that some of RK's products were likely to cause confusion with LNC's products and therefore continued sales will necessarily violate state and federal statutes (such as claims arising under the Lanham Act and deceptive trade practices under Tex. Bus. & Com. Code § 17.46). (*Id.*) These arguments are unpersuasive. The claims in this case sound in contract law, not in the Lanham Act or deceptive trade practices law. This Court will not issue a permanent injunction in anticipation of future violations based upon legal theories not at issue in this case.

RK does not argue that there is no wrongful act here, at least with regard to the Jury's finding that RK breached the Settlement Agreement; indeed, they admit that for breach of contract, Plaintiffs need not show a wrongful act if they are requesting specific performance. (Dkt. No. 238 at 5 n.8.)

### 2. Imminent Harm

LNC contends that imminent harm exists because RK has repeatedly violated LNC's intellectual property rights, and without a permanent injunction, RK will continue its pattern of wrongful conduct and continue to violate the Settlement Agreement. (Dkt. No. 237 at 5–6.) RK argues that, as to the Settlement Products, LNC has not produced any evidence proving that RK sold any of the Settlement Products after the date of the Settlement Agreement. (Dkt. No. 238 at 6.) As to the Replacement Products, RK argues that it sold those products only because it reasonably believed the Settlement Agreement did not apply to those products, not because it intended to violate its contractual obligations. (*Id.*) Thus, RK argues, LNC has not put on any evidence to show that RK will not comply with its contractual obligation moving forward, and therefore has not shown any likelihood of imminent harm to LNC.

The relevant imminent harm here would be further breach of the Settlement Agreement. Potential causes of action under trade secret laws or unfair business practices statutes are irrelevant to this analysis. LNC has not shown that there is an imminent likelihood that RK will continue to sell versions of the Settlement Products that are likely to cause confusion with LNC's products. The Court finds that LNC has not pointed to sufficient evidence to show that imminent harm exists.

### 3. Irreparable Injury / No Adequate Remedy at Law

An "irreparable injury" is one for which actual damages will not adequately compensate the injured party or the damages cannot be measured by any certain pecuniary standard. *Cytogenix*, 213 S.W.3d 479, 487 (Tex. App. – Houston [1st Dist.] 2006, pet. denied).

LNC argues that in the context of trademarks, immediate and irreparable harm is shown when unauthorized use of the marks creates a likelihood of confusion. (Dkt. No. 237 at 7) (citing

*7-Eleven Inc. v. Puerto Rico-7 Inc.*, Civil Action No. 3:08–CV–0140–B, 2009 WL 4723199 (N.D. Tex. Dec. 9, 2009)). LNC further cites patent cases to show that irreparable harm exists when companies are direct competitors and wrongful sales of one company result in lost market share for another. LNC further argues that due to RK's allegedly insufficient recordkeeping, it is impossible to calculate the pecuniary remedy that would be appropriate if RK breaches the Settlement Agreement.

RK argues that LNC has not put forth any evidence of irreparable harm, and that other courts have found that LNC does not have a protectable trade dress, at least for some of the products at issue here. (Dkt. No. 238 at 7.) RK further argues that a claim that parties are competitors cannot, by itself, establish irreparable harm. (*Id.*) (citing *Apple Inc. v. Samsung Elec. Co., Ltd.*, 735 F.3d 1352, 1360, 1362 (Fed. Cir. 2013) (finding no irreparable harm even though plaintiff and defendant were "direct competitors")). RK argues that it actually went out of its way to provide additional sales figures to LNC during discovery in this case, which RK says implies that it can be relied upon to produce and report its sales as accurately as possible. (Dkt. No. 238 at 8.)

While LNC and RK both cite case law sounding in trademark and patent law, such authority is persuasive but not binding in this contract dispute. RK has sought pecuniary damages in this case to recover the royalties on sales of the Accused Products which the Jury found violated the Settlement Agreement. Seeking and accepting such remedy indicates that the potential damages may be measured by a pecuniary standard—perhaps the very same royalty rate that has been applied in this case by LNC to calculate its damages. The Court finds that LNC has not shown irreparable injury exists or that there is no adequate remedy at law.

In sum, the Court finds that LNC is not entitled to a permanent injunction against RK.

LNC has failed to show the existence of imminent harm, the existence of irreparable injury, and the absence of an adequate remedy at law. Therefore, LNC's motion for a permanent injunction against RK (Dkt. No. 237) is **DENIED**.

## V. CONCLUSION

For the reasons set forth above, RK's motions for a new trial on damages and for remittitur (Dkt. No. 240) are **DENIED**, LNC's motion for post-verdict damages (Dkt. No. 243) is **DENIED**, RK's motion (Dkt. No. 240) for a new trial on damages on the intentional interference claim is **DENIED AS MOOT**, and LNC's motion for a permanent injunction against RK (Dkt. No. 237) is **DENIED**.

**So ORDERED and SIGNED this 6th day of July, 2016.**

*[Signature]*
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE